IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 85, JAMES HANNA, SASHA CRAIG and MONIKA WHEELER,<br><br>          Plaintiffs,<br><br>          v.<br><br>PORT AUTHORITY OF ALLEGHENY COUNTY,<br><br>          Defendant. | Case No. 2:20–cv–01471–NR<br><br>Judge J. Nicholas Ranjan |

**MEMORANDUM OF LAW IN SUPPORT OF PARTIAL MOTION TO DISMISS OF DEFENDANT PORT AUTHORITY OF ALLEGHENY COUNTY**

Port Authority, by and through its undersigned counsel, and in accordance with Rule 12(b)(1) of the Federal Rules of Civil Procedure, submits the within memorandum of law in support of the Partial Motion to Dismiss of Defendant Port Authority of Allegheny County (the "Motion").[1]

**INTRODUCTION**

For nearly 50 years, Port Authority has prohibited employees from wearing items on their uniforms (such as buttons or stickers) that contain messages of a political or social protest nature. The global pandemic that arose in March 2020 involving the novel coronavirus required individuals to obtain and wear masks or other face coverings to prevent the spread of COVID–19. Initially, Port Authority employees wore a mix of company–provided and their own masks because Port Authority was unable to procure masks in sufficient quantities to provide them to all employees to wear on a daily basis.

---

[1] Unless otherwise expressly defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

After initially focusing its efforts to ensure that all employees possessed and were wearing a mask or face covering (with limited exceptions for lunch breaks, performing job functions in which wearing a face covering would be unsafe, or medical exceptions), Port Authority revised its then–existing uniform policy to make clear that its longstanding prohibition of messages of a political or social protest nature applied to masks and face coverings.  Once Port Authority was able to secure a sufficient supply of masks from its uniform vendor, Port Authority issued an amended policy on September 16, 2020 to require its employees to wear (1) a solid blue or black mask provided by Port Authority; (2) a blue or black mask provided by Port Authority containing the "Port Authority" logo; (3) an approved mask provided by Local 85 containing the "ATU Local 95" logo; (4) a solid blue or black mask (or gaiter–style face covering) obtained on their own; or (5) an N–95 mask, KN–95 mask, or clear face shield as long as the mask or face shield head band is solid white, black, or blue in color.  The Current Uniform Policy prohibits employees from wearing masks of any other color or containing any other text, logo, or image.

While the Former Uniform Policy was in effect, a small group of employees wore masks that contained the social protest message "Black Lives Matter."  Port Authority disciplined employees who refused to remove masks that contained social protest messages that violated the Former Uniform Policy.[2]  Plaintiffs commenced this lawsuit on September 30, 2020 — after Port Authority had enacted the Current Uniform Policy — seeking declaratory and injunctive relief regarding the application of the Former Uniform Policy.

Plaintiffs' request for equitable relief in conjunction with the proper application of the Former Uniform Policy fails for a lack of standing.  By the time Plaintiffs commenced this lawsuit,

---

[2] Of the three named plaintiffs, only Hanna received a verbal warning.  Port Authority held Craig and Wheeler off of work with pay pending disciplinary hearings, but did not take disciplinary action against them because a question existed as to whether they had knowledge of the uniform policy applicable to their first–level supervisory job unit.

{DocNo=00743181.1 }

2

Port Authority had enacted the Current Uniform Policy and no longer applied the Former Uniform Policy. Port Authority employees could no longer wear a mask bearing a logo, image, or message of their choice. Instead, employees were required to wear one of the masks provided by Port Authority, an approved "ATU Local 85" mask provided by Local 85, a sold blue or black mask (or gaiter–style face covering) procured on their own, or an N–95 mask, KN–95 mask, or clear face shield. The law is clear that this Court lacks standing to issue declaratory and injunctive relief as to the constitutionality of a Port Authority policy that is no longer in effect.

## FACTUAL BACKGROUND

Port Authority is a state–created entity that owns and operates a passenger transportation system in southwestern Pennsylvania. Cetra Aff. at ¶ 3. In particular, Port Authority's roughly 2,600 employees operate, maintain, and support bus, light rail, incline, and paratransit services that provided more than 60 million rides a year (before the COVID–19 pandemic). *Id.*

Local 85 is an unincorporated voluntary labor organization that is the certified exclusive labor representative of a bargaining unit of employees employed by Port Authority. Compl. at ¶ 7. Plaintiffs Hanna, Craig, and Wheeler are members of Local 85. *Id.* at ¶¶ 8–10.

### A. The Former Uniform Policy

Effective February 1, 1972, Port Authority implemented the Former Uniform Policy to address the clothing that certain of its employees could wear at work. Cetra Aff. at ¶ 5. Among other provisions, the Former Uniform Policy stated: "Buttons and stickers of a political or social protest nature are not to be worn." *Id.* at ¶ 6.

In approximately March 2020, a global pandemic arose involving the novel coronavirus known as COVID–19. *Id.* at ¶ 7. The pandemic has resulted in millions of individuals, including residents of Allegheny County and over 50 Port Authority employees, contracting COVID–19. *Id.* While public health experts initially advised that high health risk individuals could wear masks or

{DocNo=00743181.1 }

3

other face coverings to help prevent the spread of COVID–19, a shortage of masks existed at the pandemic's outset.  *Id.* at ¶ 8.  Many public health experts initially suggested that available masks should be allocated to health care professionals, first responders, and other individuals who were most likely to interact with infected individuals.  *Id.*  Despite its best efforts, Port Authority could not initially procure sufficient quantities of masks to provide to all of its employees to wear on a daily basis.  *Id.* at ¶ 9.  In fact, some vendors advised Port Authority that federal and state governments were actively confiscating available masks to allocate them to health care professionals and facilities.  *Id.*  Following the Pennsylvania Secretary of State's issuance of an order on April 15, 2020 (effective April 19, 2020), Port Authority began requiring its employees to wear masks or other face coverings, which included a mix of surgical–style masks that Port Authority was able to obtain in limited quantities via purchases and donations from local organizations, cloth masks that Port Authority began manufacturing by temporarily repurposing its Upholstery Shop (which ordinarily repaired transit vehicle seats), and masks that employees obtained or made on their own.  *Id.*

In late May 2020, the death of an African American male by the name of George Floyd after being handcuffed and pinned to the ground by a Caucasian police officer was captured on video.  The incident lead to widespread social protests throughout the United States.  In July 2020, a Port Authority employee complained that a colleague was wearing a mask containing a social protest message in violation of Port Authority policy.  *Id.* at ¶ 10.  In order to avoid any ambiguity that the Former Uniform Policy prohibited such messages, Port Authority added language to the Former Uniform Policy to make clear that the prohibition of messages of a political or social protect nature applied to clothing (including masks or other face coverings) as well as buttons and stickers.  *Id.* at ¶ 11.  This revision took effect on July 23, 2020.  *Id.*

After Port Authority clarified that the Former Uniform Policy's prohibitions applied to masks and face coverings, a small group of Port Authority employees violated that policy by wearing masks containing political or social protests messages. *Id.* at ¶ 12. In particular:

- In late July, a group of operators wore masks that stated "Black Lives Matter." *Id.*

- In late August/early September, an operator wore a mask that stated "Thin Blue Line/Blue Lives Matter." The operator complied with Port Authority's instruction not to wear the mask any longer. *Id.*

- On August 30, 2020, a Port Authority transit security officer wore a mask that stated "Trump 2020." The officer complied with Port Authority's instruction not to wear the mask any longer. *Id.*

- In August 2020, Craig, Wheeler, and Hanna wore masks that stated "Black Lives Matter" during work or work–related proceedings. *Id.*

Unlike the majority of other employees, Craig, Wheeler, and Hanna refused to remove their masks that contained social protest messages. *Id.* at ¶ 13. Port Authority issued a warning to Hanna for refusing to remove his offending mask. *Id.* at ¶ 14. Because a question existed as to whether Craig and Wheeler had knowledge of the uniform policy applicable to their first–level supervisory job unit, Port Authority held them off of work with pay pending disciplinary hearings, but did not take disciplinary action. *Id.* at ¶ 15.

**B.     The Current Uniform Policy**

Once Port Authority was able to secure a sufficient supply of masks from its uniform vendor, Port Authority decided to revise its uniform policy regarding the face coverings. *Id.* at ¶ 16. Port Authority enacted the Current Uniform Policy on September 16, 2020 with an effective date of September 27, 2020. *Id.* at ¶ 17 and Ex. 2 thereto. Under the new policy, employees must wear one of the following masks or face coverings: (1) a solid black or navy mask provided by Port Authority; (2) a black or navy mask provided by Port Authority containing the "Port Authority" logo; (3) a Port Authority–approved mask provided by Local 85 containing a "ATU

{DocNo=00743181.1 }

5

Local 85" logo; (4) a solid black or blue mask (or gaiter–style face covering) acquired by the employees on their own; or (5) an N–95 mask, KN–95 mask, or clear face shield as long as the mask or face shield head band is solid white, black, or blue in color. *Id.* at ¶ 18. Employees may not wear a mask or face covering in any other color, or containing any other logo, text, or image. *Id.*

The Current Uniform Policy was not a surprise to Plaintiffs.  On August 24, 2020 — more than a month before Plaintiffs filed this lawsuit — Port Authority advised Plaintiffs' counsel that it was working with its uniform contractor, and would soon be in a position to issue approved face masks to all employees (and would amend its then–existing uniform policy accordingly). *Id.* at ¶ 19.  In fact, Port Authority discussed the Current Uniform Policy with Local 85 and its legal counsel during weekly COVID–19 status calls, and provided them with a copy of that policy, before the policy became effective. *Id.* at ¶¶ 19–20.  However, neither Local 85 nor its counsel responded with any comment or objection to the Current Uniform Policy (beyond a Local 85 officer commenting orally that Port Authority should have acquired the masks and issued the Current Uniform Policy sooner). *Id.* at ¶ 20.

C. <u>**The Request for Equitable Relief Regarding the Former Uniform Policy**</u>

Plaintiffs commenced this lawsuit on September 30, 2020.  Plaintiffs attach the Former Uniform Policy to the Complaint, and assert that the policy is facially unconstitutional. Compl. at ¶¶ 1, 4, 44–49 and Ex. A thereto.

In their request for relief, Plaintiffs ask the Court to declare that the Former Uniform Policy constitutes an unlawful restriction on employee free speech and association under both the United States and Pennsylvania Constitutions. *Id.* at Wherefore Clause, subsection (a). Plaintiffs also ask the Court to enjoin Port Authority from enforcing the Former Uniform Policy to prohibit them from wearing masks that state "Black Lives Matter." *Id.* at Wherefore Clause, subsection (b).

{DocNo=00743181.1 }

6

## ARGUMENT

The United States Constitution only empowers federal courts to resolve cases and controversies. U.S. Const. art. III, § 2. "Thus, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). The "case and controversy" requirement encompasses the related but distinct doctrines of standing and mootness. *Diamond v. Pa. State Educ. Ass'n*, 399 F. Supp. 3d 361, 383 (W.D. Pa. 2019). Standing addresses whether a case and controversy exists at the outset of the lawsuit, whereas mootness involves a development that occurred after the plaintiff filed suit that eliminates the controversy that existed at the suit's inception. *Hartnett*, 963 F.3d at 305–06.

The plaintiff bears the burden of proving that standing exists. *Freedom From Religion Found., Inc. v. Connellsville Area Sch. Dist.*, 127 F. Supp. 3d 283, 296 (W.D. Pa. 2015). The plaintiff must show that: (1) it sustained an actual injury; (2) a causal connection exists between the injury and the challenged action; and (3) the court's resolution of the case in its favor would redress the injury that it sustained. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Behar v. Pa. Dept. of Transp.*, 791 F. Supp. 2d 383, 390 (M.D. Pa. 2011). As the Fourth Circuit has explained: "the challenged regulation must prevent a credible threat of enforcement against the party bringing suit. A plaintiff must establish such a threat with respect to each of the provisions that it seeks to challenge, as standing regarding one aspect of a policy cannot be bootstrapped into standing as to the rest." *Rock for Life–UMBC v. Hrabowski*, 411 F. App'x 541, 547 (4th Cir. 2010) (internal citation omitted).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is the appropriate vehicle to raise the lack of standing. *Diamond*, 399 F. Supp. 3d at 375. The defendant is not required to rely upon facts alleged in the complaint, but instead, can support its motion with

{DocNo=00743181.1 }

7

additional facts. *Id.*; *see also Zapata Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d. Cir. 2000) (In resolving a motion to dismiss for lack of standing, "the court may resolve the disputed jurisdictional issues by referring to evidence outside of the pleadings, such as affidavits").

A. **Plaintiff Lack Standing to Seek to Enjoin Government Policies That are No Longer in Effect at the Time That They File Suit**

Courts have repeatedly concluded that the required case and controversy does not exist if the plaintiff seeks to enjoin a law or policy that is no longer in effect. For example, in *Vazquez v. Ragonese*, 393 F. App'x 925 (3d Cir. 2010), a prisoner filed suit against five different state correctional facilities on the basis that they had violated his constitutional rights. *Id.* at 926. Because he had been moved to a different facility before he filed suit, and was no longer subject to the conduct or policies of those five facilities, the Third Circuit affirmed that he lacked standing to attempt to enjoin unconstitutional acts at those facilities. *Id.* at 928 ("The District Court properly determined that Vazquez 'lacks standing to enjoin allegedly unconstitutional acts taking place at correctional facilities where he is no longer incarcerated.'") (internal citation omitted).

The Third Circuit's opinion in *Harnett* is instructive even though it involved mootness rather than standing. *Hartnett*, 963 F.3d at 304. The plaintiffs in that case were public school teachers who challenged the constitutionality of a Pennsylvania statute that authorized their local union to deduct fees from their paychecks, known as "agency fees," even though the teachers did not belong to the union. *Id.* While the lawsuit was pending, the U.S. Supreme Court rejected a similar statute in Illinois, holding that forcing nonmembers to pay agency fees violates their First Amendment rights. *Id.* at 304–05. The local union immediately stopped deducting agency fees from nonmembers like the plaintiffs and established procedures to return certain of the fees that it had previously collected. *Id.* at 305. Because the policy that plaintiffs challenged was no longer

{DocNo=00743181.1 }

in effect, the Third Circuit affirmed that the dispute did not present an actionable case or controversy:

> Just because a statute may be unconstitutional does not mean that a federal court may declare it so. If there is no real dispute over the statute's scope or enforceability, we must dismiss any suit attacking it . . . The parties no longer dispute whether the statute is enforceable, and there is no reason to think that anyone will try to collect agency fees from these teachers again. If a court is to formally declare the statute unconstitutional, that will have to await a future case in which the parties earnestly dispute its validity.

*Id.* at 304; *see also Diamond*, 399 F. Supp. 3d at 386 (granting motion to dismiss because the defendant stopped enforcing the allegedly unlawful policy, such that "there is no continuing conduct for this court to enjoin or declare unconstitutional"); *Rock for Life–UMBC*, 411 F. App'x at 550 ("When a facially overbroad regulation is subsequently narrowed within constitutional boundaries, the inherent threat of content–based discrimination becomes null.").

**B.   In this Case, Plaintiffs Lack Standing to Enjoin a Port Authority Policy That is That is No Longer in Effect**

Here, Port Authority replaced the Former Uniform Policy with the Current Uniform Policy on September 16, 2020 (with an effective date of September 27, 2020). Plaintiffs did not file their lawsuit until ***after*** Port Authority adopted the Current Uniform Policy. Disturbingly, nowhere in their 12–page Complaint do Plaintiffs advise the Court that Port Authority enacted the Current Uniform Policy.[3] The reason for this failure is transparent: it is black letter law that plaintiffs cannot seek equitable relief (in the form of a declaratory judgment or injunction) regarding a policy that is no longer in effect. For this reason, Port Authority's adoption of the Current Uniform Policy

---

[3] The U.S. Supreme Court has stated: "When a development . . . could have the effect of depriving the Court of jurisdiction due to the absence of a case or controversy, that development should be called to the attention of the Court *without delay*." *Bd. of License Comm'rs of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985). Accordingly, this Court has cautioned that counsel have an ethical obligation to apprise the Court of events that bring its subject matter jurisdiction into question. *Freedom From Religion*, 127 F. Supp. 3d at 298 n.8 ("In their filings, Plaintiffs seem to be tip–toeing around the mootness issue, not wanting to expressly reveal that Doe 4 is no longer a student at Junior High East. Plaintiffs' counsel is reminded that '[i]t is the duty of counsel to bring to the federal tribunal's attention, 'without delay,' facts that may raise questions of mootness.'") (internal citation omitted).

{DocNo=00743181.1 }

precludes any lawsuit seeking declaratory or injunctive relief regarding the future application of the Former Uniform Policy.

It is important to note that the President of Local 85, Stephen M. Palonis, has apparently admitted that the Current Uniform Policy is lawful. Mr. Polonis was quoted in the Pittsburgh Post–Gazette as stating that Local 85 "has no problem with the new policy." Cetra Aff. at ¶¶ 21–22 and Ex. 5 thereto. In addition, another Local 85 officer, Jeffrey DiPerna, suggested that Port Authority could have avoided any issue with its employees by acquiring the masks and adopting the Current Uniform Policy sooner. *Id.* at ¶ 20. This suggestion is disingenuous, as Local 85 is well aware that Port Authority did not initially have the capability of procuring large quantities of masks — and had to resort to repurposing a group represented by Local 85 that usually repaired vehicle seats to begin manufacturing its own cloth masks — but eventually intended to do so when it could secure a large quantity of masks. Nevertheless, Local 85's acknowledgement that the Current Uniform Policy exists (and is lawful) constitutes an admission that no case or controversy regarding the future application of the Former Uniform Policy exists.

## CONCLUSION

For the foregoing reasons, Plaintiffs lack standing to obtain equitable relief regarding a policy that Port Authority replaced (and stopped enforcing) before Plaintiffs commenced this lawsuit. The Court should therefore grant the Motion and dismiss Plaintiffs' claims for declaratory and injunctive relief.

{DocNo=00743181.1 }

10

Respectfully submitted,

**CAMPBELL DURRANT, P.C.**

By: /s/ Brian P. Gabriel
    Brian P. Gabriel
    Pa. I.D. No. 73132
    535 Smithfield Street, Suite 700
    Pittsburgh, PA 15222
    (412) 395–1267

Gregory J. Krock
Pa. I.D. No. 78308
**McGUIREWOODS LLP**
Tower Two–Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042

*Counsel for Defendant Port Authority of Allegheny County*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies the foregoing **Memorandum of Law in Support of Partial Motion to Dismiss of Defendant Port Authority of Allegheny County** was filed via the Court's CM/ECF system on the 20th day of October, 2020, which system will effectuate service upon the following counsel of record:

Joseph J. Pass<br>
Patrick K. Lemon<br>
JUBELIRER, PASS & INTRIERI, P.C.<br>
219 Fort Pitt Boulevard<br>
Pittsburgh, PA 15222<br>
*Counsel for Plaintiffs*

/s/ Brian P. Gabriel
Brian P. Gabriel

{DocNo=00743181.1 }