**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 85, *et al.*, | ) ) ) |
| | ) 2:20-cv-1471-NR |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PORT AUTHORITY OF ALLEGHENY COUNTY, | ) ) ) |
| Defendant. | ) ) |

## <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

The Allegheny County Port Authority has long prohibited its employees from wearing uniform adornments, such as buttons and stickers, that reflect "political or social-protest" messages. It has done so based on its belief that such messages are likely to lead to disruption in the workplace. This case presents a First Amendment challenge to a recent extension and modification of that policy to apply to facemasks.

In the early days of the COVID-19 pandemic, the Port Authority, like many employers, directed its employees to wear facemasks while performing their duties. Several employees, including Plaintiffs here, sought to comply with that policy, wearing masks that displayed the slogan "Black Lives Matter." They did so to express their support for the "Black Lives Matter" movement, especially after the highly publicized killing of George Floyd by a Minneapolis police officer. For a period of time, many Port Authority employees wore "Black Lives Matter" and other similar masks without incident.

Eventually, however, the "Black Lives Matter" masks came to the attention of the Port Authority's management, through a complaint from a single employee, who

asked how management would feel if he wore a "White Lives Matter" mask in response. Although the Port Authority had itself publicly endorsed the "Black Lives Matter" movement, it feared that allowing employees to wear "Black Lives Matter" masks would cause disruption (likely from other "competing" masks), much like the "political and social-protest" messages it had banned from other uniform adornments. So the Port Authority took action to prohibit its employees from wearing such masks—first by extending its preexisting policy against uniform adornments containing political or social-protest messages to apply to facemasks; and then, when that policy proved difficult to enforce, by requiring employees to wear one of a few specified facemasks and banning all others. Both of these policies were motivated by a desire to prevent workplace disruption caused by what the Port Authority viewed as controversial speech or counter-speech.

Following the policy change, several employees, including Plaintiffs here, were disciplined or threatened with discipline for wearing "Black Lives Matter" masks. So they, along with the labor union that represents them, filed this lawsuit.

Presently, Plaintiffs seek a preliminary injunction against enforcement of the Port Authority's mask policy. They argue that the policy violates the First Amendment because the Port Authority does not have a substantial interest in prohibiting its employees from engaging in innocuous expressions of personal political or social views, even at work. The Port Authority counters that, in the context of managing its workplace, it has a strong interest in heading off potential employee conflicts and customer-relations issues, and it suggests that the political and social-protest speech it seeks to ban is likely to create just those sorts of problems. The question for the Court is whether the First Amendment tolerates such restrictions.

At the heart of the First Amendment is the time-tested belief that, in almost every context, society benefits from allowing more speech, even (and perhaps

especially) when that speech is unpopular or controversial.  This belief recognizes that expressive freedom not only benefits the speaker, but also the listener, who might otherwise not be exposed to important new ideas or opportunities to challenge their own orthodoxies.  That is especially true where, as here, the speech in question relates to matters of significant public concern.  Of course, in the public-employment context, the government necessarily has much wider discretion to regulate the speech of its employees.  If the business of government is to get done, some "play in the joints"[1] is necessary to allow for restraint of speech that is likely to disrupt the workplace, interfere with customer relations, or undermine employee productivity.

But while the government is afforded unique flexibility in the employment context, that doesn't mean public employees forfeit their right to speak freely upon entering the office (or bus).  The government can restrict or punish workplace speech only if it is, in fact, likely to be disruptive of the workplace.  And when such restrictions are challenged in a lawsuit like this one, the government must support its predictions of disruption with specific evidence; perhaps not evidence of actual disruption, but at least evidence that disruption can reasonably be expected to occur.  Importantly, a speculative fear that otherwise innocuous speech could induce others to engage in counter-speech, which may, in turn, become disruptive, is not enough to justify censorship by the government, even in the employment context.

In contrast to instances of after-the-fact discipline of disruptive employees, policies that impose broad, prior restraints on employee speech are particularly suspect. Yet that type of broad policy is what the Port Authority initially adopted here when it imposed a sweeping ban on facemasks displaying any "political or social-protest" message.  In doing so, the Port Authority specifically targeted for restriction

---

[1] *See Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501 (1931) (Holmes, J.) ("The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints.").

speech that is afforded the greatest protection by the First Amendment. Further, it did so based only on a generalized and speculative fear that a "political or social-protest" message, passively displayed on a facemask, might cause other employees, or members of the public, to engage in more disruptive counter-speech. As will be discussed, this policy was arbitrary and overbroad, while the Port Authority's predictions of likely disruption are unsupported by the evidence that has been presented to the Court.

The Port Authority's subsequently adopted, facially "neutral" policy, requiring employees to wear one of a few specified facemasks, suffers from the same problems. The only proffered justification for the new policy remains the same—to prevent a perceived risk of disruption caused by employees wearing "political or social-protest" masks—and that justification remains impermissible. The Port Authority may not cure a First Amendment violation by restricting even more speech. Nor can the Port Authority's generalized interest in its uniform policy justify the new policy's broad restrictions. "Mere incantations that a pristine uniform is necessary to provide safe public transportation" are "clearly insufficient" to justify broad restraints on non-disruptive employee speech like political buttons or masks. *Scott v. Goodman*, 961 F. Supp. 424, 428 (E.D.N.Y. 1997), *aff'd sub nom. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999). That is particularly so here, where the evidence overwhelmingly suggests that the Port Authority's uniform policy is laxly enforced, such that political and social-protest uniform adornments have been tolerated for years without incident.

In sum, the Court sympathizes with the Port Authority's good-faith desire to maintain a safe and productive workplace. But the vast majority of the employee speech it has banned here—including its effective ban on "Black Lives Matter" masks—would not materially undermine that goal. Moreover, any of the truly disruptive behavior that the Port Authority fears can be readily deterred and dealt

- 4 -

with on a case-by-case basis, and likely using non-speech-based means.  For all these reasons, and based on the specific facts of this case and evidentiary record, the Court finds that Plaintiffs are likely to prevail on their First Amendment claims. The Court will thus grant their motion for preliminary-injunctive relief and enjoin the Port Authority from enforcing its ban on "Black Lives Matter" masks.

## PROCEDURAL BACKGROUND

Plaintiff Amalgamated Transit Union Local 85, along with several individual Port Authority employees, filed this lawsuit on September 30, 2020.  ECF 1.  In its complaint, the Union asserts claims under 42 U.S.C. § 1983 for violations of its members' free speech and equal protection rights under the First and Fourteenth Amendments of the United States Constitution, as well as their analogous rights under Article I, Sections 7 and 20 of the Pennsylvania Constitution. Along with its complaint, the Union moved for a preliminary injunction, asking the Court to enjoin the Port Authority from enforcing its operative facemask policy and to allow its employees to wear facemasks with the message "Black Lives Matter."  ECF 3.

The Port Authority initially responded to the Union's complaint by moving to dismiss for lack of subject-matter jurisdiction, arguing that the Union's claims were based on its older facemask policy, which had recently been superseded by a new, modified policy.  ECF 10.  On November 2, 2020, the Court granted the motion to dismiss, but allowed the Union to amend its complaint to state a claim directed at the now-operative mask policy.  ECF 16.  The Union did so on November 3, 2020,  ECF 17, and the Port Authority again responded by filing a motion to dismiss, this time for failure to state a claim under Fed. R. Civ. P. 12(b)(6), ECF 18.[2]

The Court held a two-day evidentiary hearing on the Union's preliminary-injunction motion on November 10 and 17, 2020.  ECF 27; ECF 30.  During the

---

[2] The Court has denied the Port Authority's motion to dismiss by separate order, for the reasons stated in this decision.

hearing, the Court heard evidence and testimony from 16 witnesses, followed by oral argument from counsel on the pending motions. ECF 30-1; ECF 34; ECF 36. Following the hearing, the Court issued an order directing the parties to address, in their post-hearing briefing, whether the Court should apply the modified *Pickering* standard articulated by *United States v. National Treasury Emp. Union*, 513 U.S. 454 (1995). ECF 33. The parties filed post-hearing briefs on December 8, 2020, and the matter is now ready for disposition.

## FINDINGS OF FACT

1.     Defendant Port Authority is the public transportation authority for Allegheny County and a municipal organization organized under the second-class Port Authority Act, 55 P.S. § 551, *et seq.* ECF 17, ¶ 13.

2.     The Port Authority employs over 2,700 employees, including approximately 1,700 bus operators and 600 to 700 maintenance employees. ECF 36, 97:9-13. Those employees are spread across four bus-operating locations (East Liberty, West Mifflin, Collier, and the Ross Garage), a rail center in the South Hills, maintenance buildings in the South Hills and North Side, and administrative offices in downtown Pittsburgh. ECF 36, 97:14-98:4.

3.     Plaintiffs in this case are four Port Authority employees, as well as the labor union that represents them. Specifically:

> a.  Plaintiff Amalgamated Transit Union Local 85 is the labor union and certified exclusive labor representative for a bargaining unit of Port Authority employees. ECF 17, ¶ 9. The Union is comprised of several different types of employees, with different roles. For example, some employees drive buses; some are mechanics; some are instructors; and some are disciplinary-hearing representatives. *See, e.g.,* ECF 34, 41:4-43:20, 53:19-54:7, 169:8-170:4.

    b.   Plaintiff James Hanna is a bus operator employed by the Port Authority. He is also a member and Executive Board member of the Union.  ECF 17, ¶ 10.

    c.   Plaintiff Sasha Craig is a first-level supervisor and instructor employed by the Port Authority.  He is also a member of the Union. ECF 17, ¶ 11.

    d.   Plaintiff Monika Wheeler is a first-level supervisor and instructor employed by the Port Authority.   She is also a member of the Union. ECF 17, ¶ 12.

4.    To promote "consistency" and ensure that its employees "are representing Port Authority in a cohesive manner," the Port Authority requires its employees to wear a uniform while on the job.  ECF 36, 103:17-19.

5.    As part of this policy, the Port Authority has, since 1972, prohibited uniform adornments (*e.g.,* buttons, stickers, etc.) that display "political or social-protest" messages.  ECF 36, 113:8-114:17.

6.    The Port Authority adopted its ban on political and social-protest adornments after a small group of employees wore "Free Angela Davis" buttons to advocate for the release of the then-imprisoned activist.  ECF 36, 113:17-114:17.  The same employees also engaged in a work stoppage or "wildcat strike" as part of their protest.  ECF 36, 158:12-159:1.

7.    The Port Authority contends that banning political and social-protest adornments is necessary to avoid workplace disruption, such as "disputes breaking out between employees within a garage" or "disputes breaking out with the public." ECF 36, 130:10-131:5.

8.    There is no evidence in the record suggesting that the Port Authority prohibits its employees from engaging in the exact same type of speech (*i.e.*, political or social-protest speech) in other ways, such as by communicating it verbally to co-workers or members of the public. *See generally* ECF 40-1, PDF pp. 1-22.

- 7 -

9.     The Port Authority's enforcement of its ban on political and social-protest uniform adornments has been lax and largely non-existent.  Employees often wore political buttons and other items that seemingly violated the policy, and they were rarely, if ever, disciplined for doing so prior to the incidents involving facemasks. *See, e.g.,* ECF 34, 21:9-22:4; 35:6-38:19; 47:8-48:12; 51:16-54:24; 56:14-57:8; 69:15-23; 70:6-9; 105:17-106:19; 108:7-17; 116:1-12; 117:5-13; 139:1-9; 140:2-9; 154:17-155:3 166:3-167:10; 194:3-19; ECF 36, 10:9-13; 25:21-26:9; 47:20-48:7; 54:16-19; 55:22-25; 62:23-63:16; 64:6-13; 66:5-7.

10.     By way of example, Port Authority employees over the years have worn such social or political-related adornments, without being disciplined:

a.  ECF 34, 35:13-21 ("…A: Absolutely because, listen, Port Authority has never, never in my 26 years, 27 years here, never disciplined anybody for that, for wearing a button or a pin.  Q: You talked about political presidential pins, political pins, and you mentioned ATU for Hillary. I take it those are pins that were distributed by either the local or the national? A: The international sent them to us and we handed them out to our membership, that's correct.");

b.  ECF 34, 36:20-21 ("A: Yes, the answer is yes, they would wear pins while on their route.");

c.  ECF 34, 53:19 ("Q: When you were an operator, were people wearing political buttons in support of candidates? A: Correct, including myself. Q: Can you tell us what those buttons were? A: Well, most recently in the last election, I wore a Bernie Sanders button on my uniform sweater. And I also wore, after Bernie lost, I wore an ATU for Hillary on my sweater. Q: Previous to that, did you wear any other buttons for candidates, Obama, or anyone prior to Hillary? A: Yes. Q: Do you recall

which they might have been? A: It would have been one for Obama and it might have been Clinton … I think I wore one for Clinton, also.");

d.  ECF 34, 54:8-11 ("Q: When you attended 105 hearings, do you remember specifically wearing those buttons supporting Hillary and/or Obama? A: Yes.");

e.  ECF 34, 69:15-20 ("THE COURT: Just so I understand your testimony, however in  the past, you were aware of operators wearing political buttons such as Obama or Hillary buttons while operating buses, is that right? THE WITNESS: That is correct. I personally myself wore one.");

f.  ECF 34, 105:17-106:19 ("Q: Have you observed the … Port Authority's enforcement of the uniform policy since it has been in effect? A: It is very lax.  Q: What do you mean by that? A: A lot of people wear shirts that aren't authorized or hats or shoes, pants. It's not real strict. Q: How about political, did you ever see anybody wear political buttons? A: Yes, I have.  During election campaigns they wore particular buttons supporting particular people. … Q: Anything else?  A: Sporting teams, gay pride buttons.  Q: Gay pride? A: Yes. Q: Have you seen them wear masks saying anything in support of gay pride? A: There was a few. Rainbow, like rainbow colors.  Q: Rainbow pins, have you ever seen that? A: Yes.");

g.  ECF 34, 108:7-17 ("Q: Political buttons, have you seen those? A: Yes. Q: Which ones have you seen people wore? A: Through all the elections, there was union elections where officials were running for office, they wore pins.  Then national level, Obama, Hillary, a bunch of different political pins. Q: Have you ever worn them? … A:  Pins, yes, I wore them.");

h. ECF 34, 116:1-2 ("I have worn masks with ankhs[3] on them.");

i. ECF 34, 116:11-12 ("Q: Is that a fist, black power fist, is that it? A: Yes. Q: You have been wearing them for years? A: Yes. Q: While driving? A: Yes.");

j. ECF 34, 117:5-6, 12-13 ("Q: Have you ever worn these things that you have on where Ms. Kelleman, the CEO was present? A: Yes. … Q: [She] [s]aid what was nice? A: Said my chains were nice. Q: What chains were they? A: These same two I have on, my ankh chain and my black power fist.");

k. ECF 34, 139:1-9 ("Q: During your career have you seen any individuals wearing buttons, political or other statements, that they have had on their uniforms while working? A: Yes. Q: Can you tell us what you have seen[?] A: I have seen, let's see, ATU for Hillary, crosses. Q: You say crosses, what do you mean? A: Cross necklaces.  Just last week I seen Biden pins, as well as Mason pins.")

l. ECF 34, 140:2-9 ("Q: Have you worn jewelry which had any type of issues about Black Lives Matter or things of that nature? A: Yes. On Friday I had on a pair that stated Black By Popular Demand. Q: Anything else? A: I have Black Lives Matter earrings.  I have a lot of jewelry.  I also have seen other people wearing them as well.  But I myself wear it.");

m. ECF 34, 154:17-155:3 ("Q: You have worn political buttons[?]  A: Yes, absolutely. Q: --- in support of political candidates? A: Yes.  Q: I am talking about both union candidates as well as civilians. A: Yes, yes. Yes.

---

[3] An "ankh" is an Egyptian symbol of life, increasing in prominence in African-American culture within the last 25 years. *See* The Famuan, "Ankh becomes popular symbol of Black culture," *available at* http://www.thefamuanonline.com/2002/12/04/ankh-becomes-popular-symbol-of-black-culture/.

Q: For how long and how frequently were they worn? A: … I wear a lot of buttons.");

n.  ECF 34, 166:3-167:10 ("Q: Have you seen employees wearing political support buttons for different candidates? A: Yes, I have seen Bernie, you know, Bernie. Q: Bernie Sanders? A: Yes. Different buttons for different people. … Q: Did you ever wear [an ATU Hillary '16] button? A: Yeah, I had a button. Q: For Hillary? A: Yes. Q: Did you ever have a button for any other political candidate you wore? A: I had an Obama hat. … Have you seen other employees wear buttons supporting political candidates? A: Yes, I seen -- Q: While they were working? A: I seen a MAGA hat. … Q: Anyone ever give you a problem when you were wearing those buttons? A: No.");

o.  ECF 34, 194:3-15 ("Q: Have you seen employees wearing stickers or buttons supporting other issues and causes? A: Absolutely.  They wear — let me see, where can I start? I have been here for 30 years.  Okay.  I have seen stickers for Stronger Than Hate.  I have seen Trump 2020 stickers.  I have sign [sic] MAGA hats.  I have seen political buttons that take me personally all the way back to Clinton.  Q: Did you ever wear such buttons? A: Absolutely.  I have worn every -- I am a registered Democrat.  I have worn every button that supports the Democrat party's candidate.  Q: Did anyone ever tell you you couldn't wear them? A: Absolutely not.");

p.  ECF 36, 10:9-13 ("Q: How about buttons supporting political candidates? A: Sure.  Q: Can you tell me which ones, if you remember? A: They had buttons supporting local candidates, national candidates, Clinton, Biden.");

q.  ECF 36, 25:21-26:9 ("Q: Have you ever worn any other kind of buttons,
    pins, or messages that were not on the uniform policy? A: Yes. Q: Could
    you tell the Court what they were? A: I wore Obama buttons in support
    of the election, Hillary buttons, Bernie Sanders buttons, local union
    buttons.  If we were having an election, stickers, we had stickers as well.
    Q: What do you mean by stickers? A: In support of the candidate.
    Sometimes they were not buttons, they were just stickers that you just
    put on the uniform. Q: Those were local union elections? A: Yes.");

r.  ECF 36, 47:20-48:7 ("A: I had on two necklaces.  One is a black solidarity
    fist  and the other one is an emblem of Africa.  Q: What is that on your
    t-shirt? A: That is also a black solidarity fist.  Q: Have you worn those
    chains that you have often or before or is that the first time you wore
    them? A: Every day for the past 22 to 25 years.  I have a collection of
    them.   I'm proud of them. Q: Have you worn them while you are
    working? A: Every day. I feel naked if I don't have it on.");

s.  ECF 36, 54:16-19 ("A: … I have a tree of life necklace and that ribbon
    was probably representing someone who had passed away.  I also have
    a black handkerchief in the same pocket that the ribbon is in. … Q: Did
    you go to work that day dressed exactly like that? A: Yes, I did. Q: Did
    you operate your bus in the revenue service? A: Yes, I did.")

t.  ECF 36, 55:22-25 ("Q: You have something on your necklace there; right?
    A: Yes. That's a peace symbol. Q: Did you wear it while you were working
    that day? A: Yes, I did. Q: Did anyone ever complain or tell you to take
    it off? A: No. …").

u.  ECF 36, 62:23-63:16 ("Q: What [buttons] did you see? A: I have seen
    Bernie Sanders, Hillary, Trump, Obama, Biden, I have seen things for
    like local candidates, whether it's a little sticker or whether it was a

small button or whatever. Q: Have you worn any? A: Yes. Q: What have you worn? A: I've worn Obama, I have worn Bernie, I've worn a sticker promoting myself … Q: Did you wear the buttons you spoke about, the political buttons in particular while operating in the revenue service? A: Yes.  Q: Did anyone ever say that you shouldn't be doing that? A: No.");

    v.    ECF 36, 64:6-13 ("Q: How about any other kind of buttons? A: I have seen Masonic pins, I have seen union buttons that we get from the International.  We have a few guys, the wear the buttons on their sweaters as though they are military type of medals.  I see them on their bags and everyone carries a bag onto the bus that they carry their belongings in. …");

    w.    ECF 36, 66:5-7 (Q: "What if someone were to wear a Trump -- did you ever see someone wear a Trump pin? A: Yes.").

11.    The Port Authority's Chief Legal Officer, Michael Cetra, identified seven instances of discipline imposed for uniform violations over the past six years.  ECF 36, 135:7-19.  None of those instances involved discipline for violations of the policy regarding political or social-protest adornments.  ECF 36, 135:20-136:5.

12.    Mr. Cetra also testified that no issues related to the ban on political or social-protest adornments had, to his knowledge, been brought to upper management's attention prior to 2020. ECF 36, 114:18-115:9.

13.    The Port Authority considers violations of its uniform policy to be "minor" infractions that do not warrant significant discipline.  ECF 36, 133:1-13; 136:6-10.

14.    When the COVID-19 pandemic arrived in early 2020, the Port Authority imposed an additional requirement that its employees wear a facemask as part of their uniform.  ECF 36, 115:10-117:15.

15.     Initially, the Port Authority did not have sufficient masks to provide to all its employees and so directed them to wear their own.  ECF 36, 116:7-11, 117:16-118:23.

16.     Many employees chose to wear masks that reflected political or social-protest messages related to "Black Lives Matter."  *See, e.g.,* ECF 34, 73:14-19, 82:25-83:2, 84:4-8, 105:6-10, 115:12-21, 128:20-129:4, 137:1-8; ECF 36, 19:22-20:20.  The specific facemasks presented to the Court during the hearing included, among others, masks containing the following messages: "Black Lives Matter," "BLM," "My Life Matters," "I Can't Breathe," "Unapologetically Black and Proud," "Black Matter," and "Black Voters Matter."

17.     The employees who wore "Black Lives Matter" masks, including Plaintiffs, did so to express support for the "Black Lives Matter" movement, especially after the highly publicized killing of George Floyd by a Minneapolis police officer.  *See, e.g.,* ECF 34, 115:12-21, 148:12-20, 156:24-157:1, 165:9-15, 167:25-168:3, 200:8-13; ECF 36, 65:23-66:4.

18.     More generally, the Port Authority and its CEO, Katharine Kelleman, publicly supported the "Black Lives Matter" movement.  ECF 36, 182 ("Q: She states, first and foremost, the organization believes black lives matter and this organization holds this position and that will not change.  So I assume that is still the position of the organization? A: Yes, sir."); ECF 39-1, PDF p. 46 ("First and foremost, this organization believes that Black lives matter. Period.  Despite the public debate over what we allow or don't allow on a mask or uniform, fundamentally, this organization holds this position and that will not change."); ECF 39-2, PDF p. 2 ("If you, as a white person, wouldn't want to be treated the  way you see black or brown people treated, then do the work to make it stop.  I'm committing and I hope you join me."); *id.* at PDF p. 3 ("Black lives matter.").

19.     The Port Authority's management became aware of employees wearing "Black Lives Matter" masks after a complaint from another employee, who asked how management would feel if he wore a "White Lives Matter" mask in response.[4]  ECF 36, 124:12-20; 160:16-23.

20.     Although the Port Authority had itself publicly endorsed the "Black Lives Matter" movement, it was concerned that allowing employees to wear "Black Lives Matter" masks would cause disruption—likely from other "competing" masks with more controversial messages. ECF 36, 130:10-131:5; *see* ECF 39-1, PDF p. 47 ("If Port Authority allows uniforms to be used as a message board for some political or social protest topics, we must then allow all messages on that topic, including those that could disrupt Port Authority's ability to deliver public transit service in a safe and efficient manner and cause harm to our employees, customers, and communities.").

21.     Because of its concerns, the Port Authority adjusted its policy to prohibit "Black Lives Matter" masks, initially by extending its prohibition on "political or social-protest" uniform adornments to include facemasks.  ECF 36, 107:22-108:1; 131:11-132:12.

22.     After the policy was extended to cover facemasks with "political or social-protest" messages, several Union employees were disciplined or threatened with discipline for wearing "Black Lives Matter" or other similar masks.  ECF 36, 132:16-135:6.  These employees included Plaintiffs Sasha Craig, Monika Wheeler,

---

[4] During the evidentiary hearing, the Court admitted Mr. Cetra's testimony about this complaint, over Plaintiffs' hearsay objection.  The Court did so only for the limited purpose of explaining what prompted the Port Authority to extend its uniform policy.  ECF 36, 125:5-18.  As noted on the record, the Court credits Mr. Cetra's testimony that this complaint was made, which brought the "Black Lives Matter" mask "issue" to the Port Authority's attention.

and James Hanna, as well as others. ECF 34, 123:19-124:12, 133:17-134:4, 175:19-24, 179:2-180:15; ECF 36, 45:22-46:23, 134:10-135:6.

23.     In attempting to enforce its facemask policy, the Port Authority found it difficult to navigate the "gray area" of deciding what was or was not prohibited.  ECF 36, 108:2-7.  As Mr. Cetra put it, application of the original policy required the Port Authority to wrestle with difficult questions of "is that a political message, is that a social protest message?"  ECF 36, 108:6-7.

24.     As a result, the Port Authority sought to make its mask policy "easier" and "clearer to comply with."  ECF 36, 108:2-4.[5]

25.     It did so by promulgating a new and more restrictive policy, effective September 27, 2020, under which employees may only wear one of several approved masks. ECF 36, 104:15-19; ECF 40-1, PDF p. 4.  Those masks are (a) a Port Authority logo mask provided by the Port Authority; (b) an ATU 85 union mask provided by the Union; and (c) a solid blue or black mask, or a surgical N-95 or KN-95 rated mask, that is either provided by the Port Authority or brought from home by the employee. ECF 40-1, PDF p. 4.  The policy further provides that "no other masks or face coverings are permitted to be worn while on duty" and that "[p]ermitted masks or face coverings shall not be altered or affixed with any pins, stickers, logos, images, text, color[,] and/or color combination or scheme not permitted as described above." *Id.*

---

[5] Notably, the Supreme Court and Third Circuit have both held that policies that ban speech defined only as "political" are unconstitutionally vague. *See Minnesota Voters All. v. Mansky,* 138 S. Ct. 1876, 1888 (2018) ("[T]he unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause Minnesota's restriction to fail even this forgiving test."); *Ctr. for Investigative Reporting v. Se. Pennsylvania Transportation Auth.,* 975 F.3d 300, 316 (3d Cir. 2020) ("[SEPTA] fails to offer any reason why the lingering references to advertisements that 'contain political messages' and those that address 'political issues' are any more capable of reasoned application than those that were struck down.").

26.     This September 27, 2020, policy is presently the operative policy—meaning that employees who wish to wear "Black Lives Matter" masks remain unable to do so.  ECF 36, 104:15-19.

27.     There is no evidence that any member of the public has complained to the Port Authority about a bus driver, or any other employee, wearing a "Black Lives Matter" or other similar mask during the time-period where such masks were permitted.  *See, e.g.,* ECF 36, 121:24-122:2, 163:5-17; ECF 34, 34:22-25.

28.     Several bus drivers testified that they received positive and supportive comments from customers about their "Black Lives Matter" masks.  *See, e.g.,* ECF 36, 49:12-14 ("A: Nothing but comments that were positive, that they liked them, that they liked them as much as I liked them."); ECF 34, 119:12-16 ("Q: Anyone ever -- how about your passengers, did they ever comment on what you were wearing, Black Lives Matter? A: No. Q: Or your chains? A: I usually get compliments."); ECF 34, 190:5-9 ("Q: Did any of the public say anything about it? A: No, actually complimented me on it. Q: In what way? A: Hey, I appreciate you standing up for us.  Hey, I like that mask."); *see also* ECF 34, 151:7 ("I get a lot of compliments on my buttons.").

29.     The testifying Port Authority employees stated that they either viewed "competing" masks (such as those supporting the police or supporting "all lives") favorably, or at least expressed that they had no objection to others' rights to wear facemasks that express differing views from their own.  ECF 34, 65:23-66:9, 96:1-12, 133:2-16, 206:3-209:16; ECF 36, 66:5-9, 84:7-14.

30.     There is no evidence that any work stoppage or strike was caused by an employee wearing a "Black Lives Matter" or other similar mask.

31.     There is no evidence of any disruption of bus operations or reduction in employee productivity attributable to an employee wearing a "Black Lives Matter" or other similar mask.  *See* ECF 36, 168:11-13 ("Q: … There weren't any operational disruptions; were there? A: That's correct. …").

32.     There is no evidence of any instances of workplace violence, either between coworkers or with the public, attributable to an employee wearing a "Black Lives Matter" or other similar mask.

33.     On the Port Authority's buses, a bus driver is typically the only employee aboard.  Further, in light of the COVID-19 pandemic, the bus driver now sits behind a shield, and buses operate at reduced capacity, with passengers required to wear masks and socially distance.  *See* ECF 36, 101:23-102:15, 146:16-24 ("...The reality is you are getting on a bus. The bus driver is sitting behind a fare box.  Now all of them have it but even then, most of them.  There is a spit shield, the driver shield, now it has become a COVID shield, but a shield they can deploy in front of them.  They are typically facing this way. ... I'm not dressing them down to see if they are in uniform.").

34.     The Port Authority has itself engaged in public speech regarding political and social-protest issues, including by displaying such speech prominently on its buses (*e.g.,* a LGBT "pride" themed bus; an African-American heritage themed bus).  ECF 36, 59:24-60:23, 148:1-13.  There is no evidence that these displays or pronouncements have resulted in complaints from the bus-riding public, hostility towards drivers of those buses, or other negative consequences (aside from some employees requesting that they not be made to drive the "pride" bus).

35.     The Port Authority contends that it has a unique "history of racial tension in the workplace[.]"  ECF 41, p. 13.  The Court finds that this assertion is not supported by the record.  The Port Authority has almost 3,000 employees and has operated in Allegheny County for decades.  *See* Finding of Fact ¶ 2.  Yet it cited only two instances of arguable racial incidents, one of which occurred 14 years ago, to support this assertion.  ECF 36, 127:6-128:23.  In the Court's view, neither incident is sufficiently specific and probative evidence of any unique "history of racial tensions" at the Port Authority.

36.     The Port Authority contends that, before it prohibited the "Black Lives Matter" masks, "employees complained on social media when a bus operator by the name of Vincent Brandon wore a Black Lives Matter facemask while on duty."  ECF 41, pp. 12-13.  The Court finds that this assertion is only partly supported by the record.  In the cited portion of his testimony, Mr. Brandon was not asked about, and did not mention, any posts on social media complaining about him wearing a "Black Lives Matter" mask.  Rather, he was asked if *he* recalled stating on social media that other members of the Union had complained about his mask.  ECF 34, 95:3-20. He responded that he "vaguely recall[ed] that" but "can't recall any specific incident that I may have posted about."  *Id.*  Counsel then followed up by asking Mr. Brandon if he was aware of other employees with complaints "aside from what [he] posted about," and he responded that he "never had anybody directly confront me."  ECF 34, 95:21-25. This testimony is, at best, ambiguous and does not support a finding that employees "complained on social media" about Mr. Brandon's mask.

37.     The Port Authority contends that Mr. Brandon also "conceded that he is sometimes offended when people wear 'Thin Blue Lines' facemasks to support police officers."  ECF 41, p. 13.  The Court finds that this assertion is largely true, but incomplete. Mr. Brandon did testify that he "ha[s] been offended" by others wearing "Blue Lives Matter" or "All Lives Matter" masks, depending "on how it's being done." ECF 34, 96:18-20.  But he also testified that he believed all Port Authority employees should be free to wear "Blues Lives Matter" or "All Lives Matter" masks, because "the First Amendment reigns supreme in this country" and "[y]ou should have the right to voice your opinion respectfully and peacefully."  ECF 34, 96:1-12.  He further explained that he felt employees wearing such masks were simply "showing their support for what they believe," and that he "support[s] that freedom that they have." ECF  34, 98:17-21.

- 19 -

38.     The Port Authority contends that "employees complained on social media" about an employee named Timothy Eads, who "wore a Thin Blue Lines [sic] facemask while on duty," and that those employees "called him a racist." ECF 41, p. 13. The Court finds that this assertion is only partly supported by the record. Mr. Eads, who is Black, did testify that he wore a "Thin Blue Line" mask at work (although he also supports "Black Lives Matter"). ECF 34, 126:7-11, 131:17-18. Mr. Eads testified that he is an avid Facebook user who is "kind of popular" and has "like 2,000 friends on Facebook." ECF 34, 132:18-20. He acknowledged that people on social media (not necessarily Port Authority employees) had asked him "as a black man why would [he] support the police" and "accused [him] of being a racist" because of his public support for the police. ECF 34, 132:1-8. But he did not testify that multiple Port Authority employees complained on his Facebook page or, for that matter, accused him of being racist. Instead, he was only asked about one post on his Facebook page by someone who "appeared to be a fellow employee." ECF 34, 132:18-23. That post, made in response to a picture of Mr. Eads wearing a "Thin Blue Line" mask, stated: "The problem is that Port Authority said we are not allowed to wear Black Lives Matter mask, so how is a Blue Lives Matter mask acceptable." ECF 34, 132:9-17. The post ended by thanking Mr. Eads for "good argument and debate." *Id.*

39.     The Port Authority contends that an employee named Devin Veyda complained about other employees wearing "Black Lives Matter" facemasks in a "Roundtable" message chain of Union employees. ECF 41, p. 13. The "Roundtable" is a messaging group of some kind, privately administered by Plaintiff Sasha Craig. ECF 34, 202:15-22. The Port Authority suggests that Mr. Veyda "became so disruptive to the Roundtable that Mr. Craig banned him from that forum." ECF 41, p. 13. The Court finds that these assertions are mostly consistent with Mr. Craig's testimony, which the Court credits. Specifically, Mr. Craig testified that Mr. Veyda contacted him via "Messenger, DM, direct messaging" to express concerns about

employees wearing "Black Lives Matter" masks.  ECF 34, 204:12-17.  Mr. Craig also testified that Mr. Veyda is "no longer a member of the Local 85 roundtable because he was very disruptive, very disrespectful, and … counterproductive to what we were trying to get accomplished[.]"  ECF 34, 204:20-24.

40.    The Port Authority asserts that "tension within Local 85 over the Black Lives Matter facemasks resulted in name-calling and the pressure to 'take sides.'"  ECF 41, p. 13.  The Court finds that this assertion is not supported by the record.  As evidence, the Port Authority cites only one message that Plaintiff Sasha Craig sent or posted on social media.  *See* ECF 34, 210:5-211.  In it, Mr. Craig referred to Devin Veyda as a "bratty child," argued that the Union should support employees wearing "Black Lives Matter" masks, and suggested that if Mr. Veyda wanted to "wear a White Lives Matter mask, then [he should] go ahead and wear it."  ECF 34, 210:15-20.  This evidence may reflect an outside-the-workplace dispute between Mr. Craig and Mr. Veyda about Union policy, but it does not establish broader pressure to "take sides," or "tensions rising" within the entire Union.

41.    The Port Authority also complains about, and seeks an adverse inference for, the spoliation of certain text messages by the Union's President, Stephen Palonis, and its Assistant Business Agent for Operations, Theodore Kielur.  ECF 41, pp. 15-20.  That request is based on Mr. Palonis's and Mr. Kielur's testimony that they deleted some of the text messages they received from union members about the "Black Lives Matter" mask issue.  ECF 34, 30:4-16.  The Court finds no bad faith by Mr. Palonis or Mr. Kielur that would warrant a sanction, such as an adverse inference.  Nonetheless, out of an abundance of caution, the Court will grant the Port Authority's request for an adverse inference, and will infer that Mr. Palonis and Mr. Kielur received additional text messages from Union employees, and that those text messages, if preserved, would have reflected disagreement or displeasure with both

the Union's support for this lawsuit and, more broadly, its position supporting the wearing of "Black Lives Matter" masks.

## LEGAL STANDARD

"The decision to grant or deny a preliminary injunction is within the sound discretion of the district court." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 114 (3d Cir. 2018) (citation omitted). However, preliminary-injunctive relief is an "extraordinary remedy" that "should be granted only in limited circumstances." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017).

In First Amendment cases, however, "the initial burden is flipped." *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020). In other words, "[t]he government bears the burden of proving that [its conduct] is constitutional" and "the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of [its conduct]." *Id.* (cleaned up). To trigger the government's burden, the plaintiff need only "make a colorable claim that the [government's conduct] restricts some form of speech." *Id.* (cleaned up). If the plaintiff makes that preliminary showing, "[t]he government must then justify its restriction on speech under whatever level of scrutiny is appropriate … given the restriction in question." *Id.* (cleaned up). If the government fails to establish that the restriction is constitutional, "the challenger must still demonstrate irreparable harm[.]" *Id.* (citation omitted). But such harm "is generally presumed where the moving party's freedom of speech right is being infringed." *Id.* (citation omitted).

- 22 -

## DISCUSSION & ANALYSIS

I.  **The Union is likely to succeed on the merits of its First Amendment claim.**

The Court turns first to whether the Union has demonstrated a likelihood of success on the merits of its First Amendment claim. "To satisfy this requirement for preliminary relief, the movant need only prove a prima facie case, not a certainty [it will] win." *Issa*, 847 F.3d at 131 (cleaned up). Thus, the Union must show only that it has a "reasonable probability" of success at trial. *Id.* (citation omitted). Further, because this is a First Amendment case, the Port Authority bears the burden of proving that any restrictions on its employees' speech rights are constitutional. *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133.[6] Based on the evidence presented, the Court finds that the Port Authority has not carried its burden and, as a result, that the Union is likely to prevail.

When it acts as an employer, the government has a somewhat greater-than-usual interest in restricting its employees' free-speech rights. But this discretion is not without limit. It is well-established that "[p]ublic employees have a First Amendment right to speak freely on matters of public concern." *Curinga v. City of Clairton*, 357 F.3d 305, 309 (3d Cir. 2004) (citations omitted); *see also Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) ("The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens."). Accordingly, the government may restrict or penalize such speech only if it is "likely

---

[6] The burden shifts to the Port Authority because the Union has met its initial burden of making "a colorable claim" that the Port Authority "restricts some form of speech." *Greater Phila. Chamber of Commerce*, 949 F.3d at 133. The Port Authority does not dispute that the policies in question restrict employee speech. To the contrary, the express purpose of both the original and amended mask policy was to restrict employee speech that the Port Authority perceives to be disruptive.

to disrupt the efficient operation of the workplace." *Grigsby v. Kane*, 157 F. App'x 539, 542 (3d Cir. 2005) (cleaned up).

To effectuate this standard, the Supreme Court has described two related but differing tests for evaluating restrictions on public-employee speech. The test to apply depends on the nature of the restriction at issue.

First, where "a public employer penalizes a particular employee because of past expression," the Court applies the familiar balancing test of *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). *Swartzwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir. 2002). Under that test, the Court begins by asking whether the employee's speech involved a "matter of public concern," meaning that the speech is "fairly considered as relating to any matter of political, social[,] or other concern to the community." *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001) (cleaned up). If the answer is yes, the Court considers whether the employee's First Amendment "interest in the speech … outweighs any potential disruption of the work environment and decreased efficiency of the office." *Curinga*, 357 F.3d at 312. The government bears the "burden to establish that its interest in [disciplining the plaintiff] outweighed [the plaintiff's] expressive interests[.]" *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 322 (S.D.N.Y. 2019). And while the government "need not show the existence of actual disruption" caused by the employee's speech, it must at least show "that disruption is likely to occur because of the speech." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015) (citation omitted).

Second, where a government employer "restricts employee speech before it occurs, rather than penalizing employee speech after the fact," the Court applies the modified *Pickering* analysis described in *United States v. National Treasury Employees Union ("NTEU")*, 513 U.S. 454 (1995). *Swartzwelder*, 297 F.3d at 235. This differs from the ordinary *Pickering* test in that the government must make an even more difficult showing "that the interests of both potential audiences and a vast

group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the operation of the government." *Swartzwelder*, 297 F.3d at 236 (cleaned up). This is an "exacting standard." *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir. 1996).

Here, the Court finds that the heightened *NTEU* standard applies. The Port Authority initially adopted a policy extending its ban on uniform adornments displaying "political or social-protest" messages to the facemasks it directed employees to wear due to the COVID-19 pandemic. *See* Findings of Fact ("FOF"), ¶ 21. When that policy proved difficult to administer and enforce, the Port Authority decided to prohibit the political and social-protest messages it viewed as potentially disruptive by adopting a broader restriction that allowed employees to wear only a few, specifically identified masks while on duty. FOF, ¶¶ 23-25. Both policies represent exactly the type of broad, prior restraint on speech that falls squarely within *NTEU*'s ambit.[7]  But even assuming the more flexible *Pickering* standard

---

[7] The Port Authority argues that the *NTEU* standard should not apply because the Supreme Court later "clarified," in *City of San Diego v. Roe*, 543 U.S. 77 (2004), that "the heightened NTEU standard only applies if the policy restricts speech **outside the workplace** on topics unrelated to the employment." ECF 41, pp. 4-5 (emphasis added).  But the Port Authority reads too much into the quote it cites from *Roe*, in which the Supreme Court merely observed that public-employee speech **"[o]utside of [the] category [of matters of public concern]"** can still be protected by the First Amendment "when government employees speak or write on their own time on topics unrelated to their employment[.]" *Roe*, 543 U.S. at 80 (emphasis added). The Court did not discuss or impose any "off the clock" requirement on speech related to matters of public concern.

On that point, the Third Circuit has broadly described *NTEU* as applying in any case involving a "generally applicable statute or regulation, as opposed to a particular disciplinary action[.]"  *Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Phila.*, 763 F.3d 358, 369 (3d Cir. 2014) (cleaned up).  Consistent with this precedent, the Court find that while both "*Pickering* and *NTEU* arose in the context of speech activities that occurred during non-duty hours," they "also recognized that the same balancing test applies during duty hours, although the potential for 'immediate workplace disruption' would be greater in such situations." *Am. Fed'n of Gov't Employees v. D.C.*, No. 05-0472, 2005 WL 1017877, at *10 (D.D.C.

applies, the Port Authority's approach still violates the First Amendment rights of its employees. The Court will therefore analyze this case under both the *NTEU* and *Pickering* standards.

In assessing the policy, the Court must consider two relevant questions: First, under the original policy, was it constitutionally permissible for the Port Authority to prohibit its employees from wearing masks that display "political or social-protest" messages? Second, under the amended policy, is it constitutional for the Port Authority to require its employees to wear one of a few, specified masks in order to prevent them from engaging in the "political or social-protest" speech it views as disruptive? For the following reasons, the answer to both questions is "no."

### A.   The Port Authority's prohibition of masks with political or social-protest messages violates the First Amendment.

To begin, the Court will consider the constitutionality of the Port Authority's original policy, which prohibited employees from wearing masks that displayed political or social-protest messages. That policy has been superseded by the Port Authority's new policy, but the individual employees were disciplined under that policy, and the Port Authority admits that it adopted its new, "neutral" policy to ban the same messages in a more administrable way. FOF, ¶¶ 23-25. Thus, the Court

---

May 2, 2005) (citation omitted). Thus, consistent with the First Amendment's broader disfavor of prior restraints, the key distinction drawn by *NTEU* was not between speech at work and speech outside of work, but between, on one hand, broad, prior restraints on employee speech related to matters of public concern, and, on the other hand, after-the-fact disciplinary proceedings against individual employees. *See Urofsky v. Gilmore,* 216 F.3d 401, 407 (4th Cir. 2000) ("[T]he place where the speech occurs is irrelevant: An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace."); *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749–50 (7th Cir. 1999) ("The Court [in *NTEU*] recognized that a prior restraint, as opposed to a *post hoc* disciplinary decision, poses problems not present in *Pickering*. With a prior restraint, the impact is more widespread than any single supervisory decision would be[.]") (citation omitted); *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect.").

finds it necessary and appropriate to analyze both policies here.  Starting with the original policy, on this factual record, and in the context of this government employer, the Court concludes that a ban targeting masks with political or social-protest messages violates the First Amendment.

As an initial matter, there is no dispute that a ban on any type of political or social-protest speech strikes at the heart of the most valuable speech protected by the First Amendment.   "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (cleaned up).  Here, the Union's employees wish to wear facemasks that comment on the "Black Lives Matter" movement.  FOF, ¶¶ 16-17. Neither party disputes that this is an issue of significant public concern, and so the Port Authority must make a sufficiently weighty showing of likely disruption to overcome its employees' significant interest in that speech.  *See Munroe*, 805 F.3d at 472 ("In short, the inquiry involves a sliding scale, in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public.") (cleaned up).

The Port Authority makes two main arguments. It first argues that its restriction is reasonable because it applies only while employees are on duty.  Then, it argues that it has an interest in prohibiting political and social-protest speech on masks because speech of that kind is potentially disruptive in the workplace. Based on the evidentiary record here, the Court finds both of these arguments unpersuasive.

### i.      Speech "on the clock" is not exempt from First Amendment protection.

Initially, the fact that the speech restriction here applies only in the workplace, while employees are on duty, is not dispositive.  Certainly, it is relevant that the Port Authority has not attempted to ban its employees from wearing masks and buttons outside of work. That would clearly be unconstitutional.  But speech "on the clock" is

not categorically exempt from First Amendment protection either. "An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace." *Urofsky,* 216 F.3d at 407; *see, e.g., Rankin v. McPherson*, 483 U.S. 378, 379–80 (1987) (holding that clerical employee could not be constitutionally discharged for stating "[i]f they go for him again, I hope they get him," in reference to attempted assassination of President Reagan, during a conversation with another employee at work); *Am. Fed'n of Gov't Employees*, 2005 WL 1017877, at *10 ("[T]he same balancing test applies during duty hours, although the potential for 'immediate workplace disruption' would be greater in such situations.") (citation omitted).

Thus, the Court must still assess whether the Port Authority has shown that disruption is "likely" to result if employees are permitted to wear masks that display "Black Lives Matter" or similar messages in the workplace.

ii.      **The Port Authority has failed to make a substantial showing, based on specific evidence, of actual or likely disruption.**

The Port Authority has failed to present sufficient evidence that allowing its employees to wear "Black Lives Matter" or equivalent masks is "likely to disrupt the efficient operation of the workplace." *Grigsby*, 157 F. App'x at 542.

To be sure, the Port Authority clearly believes that political or social-protest speech could be disruptive. But "[m]ere allegations of disruption are insufficient to put the *Pickering* balance at issue." *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000) (citation omitted); *Harman v. City of New York*, 140 F.3d 111, 123 (2d Cir. 1998) (explaining that a government-employer "cannot justify broad restrictions on First Amendment rights by supposition alone."). Instead, the Port Authority must "make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." *Waters v. Churchill,* 511 U.S. 661, 674 (1994) (citations omitted); *Cragg*

*v. City of Osawatomie, Kan.*, 143 F.3d 1343, 1347 (10th Cir. 1998) ("We will defer to a public employer's reasonable predictions of disruption, but those predictions must be supported by the presentation of specific evidence.").

It has not done so here. Instead, the Port Authority's position reflects an outsized fear of relatively harmless, but important, employee speech—a view that is incompatible with the First Amendment, even in the unique context of a government workplace. Initially, there is no compelling evidence of ***actual*** disruption caused by employees wearing masks that display political or social-protest messages. At most, the Port Authority has identified (1) a few social-media messages or posts by Port Authority employees that can be viewed as reflecting debate about whether employees should be allowed to wear "Black Lives Matter" or "Thin Blue Line" masks;[8] and (2) text messages reflecting (and a requested spoliation inference inferring) internal disagreement among Union members, either about the Union's support for "Black Lives Matter" and employees wearing "Black Lives Matters" masks generally, or about the Union's decision to litigate this particular case. *See* FOF, ¶¶ 36, 38-41.[9]

What is missing, however, is any evidence of complaints from bus riders or the public about drivers wearing certain masks; conflict or violence between employees

---

[8] As detailed in the Court's Findings of Fact, there are only a few, borderline examples of this. FOF, ¶¶ 36, 38-41. Additionally, nearly all those examples involved Plaintiff Sasha Craig, whom the Court found to be uniquely outspoken and vocal on these issues. *See, e.g.,* ECF 34, 206:20-207:9 ("A: Sir, I am going to have to apologize to you because this is going to take a minute. Please forgive me. My name is Sascha Craig. I was born in 1964 in West Germany of an African-American father and a German mother …"). The one exception was a post ending in "good argument and debate." FOF, ¶ 38. Thus, the Port Authority has not presented evidence of significant or widespread expressions of employee displeasure on social media. *Id.*

[9] The Port Authority also suggests that it has a "history of racial tension" that warrants a heightened degree of precaution. As detailed in the Court's Findings of Fact, this assertion is not supported by the record. FOF ¶ 34. Instead, it is based only on (largely hearsay) testimony from its Chief Legal Officer, Michael Cetra, about

or members of the public; impediments to employees performing their work; decreased employee efficiency; or any other negative impact *in the workplace* attributable to employees wearing masks that feature political or social-protest messages. *Cf. Nichol v. ARIN Intermediate Unit 28,* 268 F. Supp. 2d 536, 560 (W.D. Pa. 2003) (Schwab, J.) ("Plaintiff's wearing her cross has not been disruptive, controversial (until banned by ARIN), distracting or confusing to students, nor has it caused any dissension or problems in the working or school environment. There is no evidence—nor even an allegation—that it causes any interference with ARIN's operations.").

Of course, the Port Authority is right to say that evidence of actual disruption is not necessarily required. *See Munroe*, 805 F.3d at 472. Under *Pickering*, a government-employer's reasonable prediction of "likely" disruption can be enough, so long as the feared disruption is significant enough to overcome the employee's expressive interests. *Id.* But the lack of any evidence of actual disruption is nonetheless telling here, given the ample opportunity for such disruption to occur in connection with (1) several months of drivers wearing masks with political and social-protest messages, FOF, ¶¶ 15-18; (2) Port Authority drivers routinely wearing political buttons and other adornments with such messages for many years (despite the policy against it), FOF, ¶¶ 9, 10; and (3) the Port Authority's own political and social-issue messaging; for example, its public pronouncements that support "Black Lives Matter" or the political and social-issue messages that are placed on its buses—which are often far more prominent than a message on a mask or button, *e.g.,* LGBT "pride" and African-American heritage themed buses.[10]  FOF, ¶ 34; *see also Watters*

_____

two arguable instances of racial tension, one of which occurred 14 years ago. *Id.*  In the Court's view, two relatively minor, racial incidents in 14 years does not evince any significant history of racial tension. *Id.*

[10]  With respect to its own political messaging, the Port Authority points out that it is free to engage in speech on its own without necessarily permitting its employees to

*v. City of Phila.,* 55 F.3d 886, 896 (3d Cir. 1995) (noting that evidence of "actual disruption" would "obviously be highly relevant" to the *Pickering* analysis); *Scruggs v. Keen*, 900 F. Supp. 821, 833 (W.D. Va. 1995) ("Strong evidence of a lack of likely disruption is the lack of actual disruption.") (citation omitted).

As for the social-media chatter identified by the Port Authority, the Court does not find this to be persuasive evidence of potential disruptiveness for purposes of a *Pickering* analysis. The posts in question are few in number and reflective of only generalized displeasure or disagreement between employees. FOF, ¶¶ 36, 38-41. Moreover, the Court is loath to allow the restriction of public-employee speech based on a few social-media posts by individual employees, and the largely imaginary concern that ill-considered or hyperbolic online communications will extend into the workplace. Put simply, the fact that the Port Authority was able to find a few employees expressing displeasure with bus drivers' masks on social media simply cannot justify a sweeping, prior restraint on political expression by any Port Authority employee.

For similar reasons, the Court also finds the evidence of disagreement or conflict during the Union's internal discussions to be a fundamentally different sort of "disruption" than that with which *Pickering* is concerned. Unions exist, at least in large part, for the very purpose of providing workers with a forum to air workplace grievances and seek representation of their interests. Given that, it is unsurprising to find members debating what issues the Union should advocate for or how it should

---

engage in the same speech. *See* ECF 36, 149:16-18 ("I think it's very different from us. No. 1, I think it's different because it's our speech and we can choose what we say as an agency."). That is true, but it also doesn't negate the relevance of that evidence. The Port Authority's own political messaging remains relevant because, if political or social-protest speech is indeed inherently "disruptive," one might expect to see some evidence of disruption caused by the Port Authority's prominent display of those messages over the years. But there is no evidence that any such disruption has occurred, which calls into question why the Port Authority expects that it will now occur when employees engage in equivalent or even less intrusive speech.

go about doing it.  It is also unsurprising that employees would send their Union president messages, expressing displeasure about pursuing certain litigation or expressing certain views on behalf of the Union.  Such debates may become heated from time to time.  But without more, this sort of internal debate (much of it on virtual platforms) doesn't suggest that employees are likely to bring those virtual disputes into the real workplace.  Indeed, it is again telling that no employee is alleged to have done so here, despite having ample opportunity.

More fundamentally, the Port Authority's policy confuses its legitimate interest in preventing workplace or operational disruption with a more generalized and entirely speculative fear that political or social-protest speech might be controversial and upset co-workers or members of the public, or lead to counter-messages that could, in turn, lead to disruption.  Indeed, it is clear that the Port Authority's *real* concern has little to do with a fear that disruption will be caused by the message "Black Lives Matter" itself.  The Port Authority publicly supports the "Black Lives Matter" movement.  Rather, the Port Authority is worried that employees will start wearing more controversial masks in response, such as "White Lives Matter" and the like.  But, as a factual matter, the record doesn't reflect anyone wearing a mask depicting a responsive message of any kind that has created actual or likely disruption.[11]  And a restriction on First Amendment rights in a government workplace cannot be based on speculation over a risk of disruption caused by speech

---

[11] There is evidence of one of the Union employees, Timothy Eads—an African-American male who is a former police officer—wearing a "Thin Blue Line" mask on occasion, in support of the police. But there is no evidence that this mask created or risked creating any disruption.  FOF, ¶¶ 26-32.  In fact, the testimony of many of the employees—which the Court views as credible—was that they either viewed "competing" masks, such as those supporting the police or supporting "all lives," favorably, or at least acknowledged having no objection to others expressing differing views.  FOF, ¶ 28.

or messages that others may potentially convey in the future.  That is simply too attenuated of a risk of disruption.

Put differently, while it may certainly discipline employees for rude or disruptive behavior, the Port Authority does not have a legitimate, let alone weighty, interest in ensuring that its employees do not express, in any fashion, a political or social position at work that might inspire a co-worker or member of the public to disagree.  Indeed, under *Pickering*, "threatened disruption by others as a result of speech may not serve as a justification for public employer discipline" at all.  *Scruggs*, 900 F. Supp. at 833–34; *see also Watters*, 55 F.3d at 897 ("[D]isruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself."); *see, e.g. Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) ("The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future."); *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("[T]he perceived threat of disruption … was caused not by the speech itself but by threatened reaction to it by offended segments of the public. … [W]e think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action[.]").

To hold otherwise would run contrary to the entire premise of the First Amendment, which is that disagreement and debate are not evils to be feared or purged, but societal goods to be welcomed and nurtured.  Simply put, Americans have both the "right and civic duty to engage in open, dynamic, rational discourse," and those "ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *United States v. Alvarez*, 567 U.S. 709, 728 (2012).  As such, the Court declines to legitimize the erroneous, if increasingly endemic, view that mere exposure to differences of opinion is a harm to be feared or

avoided.[12]   The reality is that conversations about matters of public concern "routinely tak[e] place at all levels in the workplace," and the risk that such speech "will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful." *Rankin*, 483 U.S. at 393 (Powell, J. concurring).

In any event, to the extent that the *NTEU* standard applies, even assuming the Port Authority's stated goal of avoiding potential discord arising from political or social-protest speech is legitimate, the policy it has adopted is ill-fitting and not at all tailored to achieving that end. *See Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Phila.,* 763 F.3d 358, 375 (3d Cir. 2014) ("While *NTEU* did not explicitly establish a tailoring requirement, we have noted that such a requirement seems to be implicit in the Court's discussion.") (cleaned up); *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977) (under *Pickering*, "regulations may be promulgated, but their restrictive effect may extend only as far as is necessary to accomplish a legitimate governmental interest."); *Wolfe v. Barnhart*, 446 F.3d 1096, 1107 (10th Cir. 2006) ("Other courts have recognized that the tailoring requirement is an important aspect of the *Pickering / NTEU* analysis.") (citations omitted); *see, e.g.*, *Guthrie v. Bradley*, No. 06-0619, 2008 WL 4279805, at *7 (W.D. Pa. Sept. 15, 2008) (Conti, J.) ("While these are legitimate government concerns, regulations enacted for the purpose of realizing these goals can have no greater restrictive effect than necessary for their accomplishment.").

On one hand, the policy is underinclusive in an arbitrary fashion.  That is, both the current and former versions of the policy relate only to messages conveyed on facemasks and other uniform adornments.  Yet the Port Authority does not prohibit

---

[12] *See* G. Lukianoff and J. Haidt, *The Coddling of the American Mind*, at p. 29 ("A culture that allows the concept of 'safety' to creep so far that it equates emotional discomfort with physical danger is a culture that encourages people to systematically protect one another from the very experiences embedded in daily life that they need  in  order to become strong and healthy.").

its employees from engaging in the exact same speech at work in other, seemingly more intrusive ways.  For example, a bus driver could, without violating any policy, greet each passenger who boards the bus by saying "Good morning, Black Lives Matter," discuss "Black Lives Matter" with a co-worker in the workplace, or text or tweet about "Blacks Lives Matter" during the work day.[13]  The Port Authority does not explain why it is disruptive for an employee to passively communicate that "Black Lives Matter" by wearing a mask with a logo, if communicating the exact same message verbally and directly is not.

At the same time, the policy is also overbroad.  This is so for two reasons.  First, much of what the Port Authority speculates might be induced by the type of speech it has prohibited—such as employees fighting among themselves or with customers—either is or easily could be prohibited and deterred directly, through other, non-speech related policies.  *See, e.g., Waters*, 511 U.S. at 673 ("[A] public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large.").  An "across-the-board prohibition of the wearing of political buttons [or masks] is invalid" where "there are far less sweeping means available to safeguard legitimate governmental interests." *Am. Fed'n of Gov't Employees, AFL-CIO v. Pierce*, 586 F. Supp. 1559, 1561 (D.D.C. 1984); *see also Sypniewski v. Warren Hills Reg'l Bd. of Educ.,* 307 F.3d 243, 260 (3d Cir. 2002) ("Speech codes are disfavored under the First Amendment because of their tendency to silence or interfere with protected speech."); *Harman v. City of New York*, 140 F.3d 111, 123 (2d Cir. 1998) ("[T]he City has not shown that the executive orders are designed to address the asserted harm in a direct and material way. … This sweeping prior restraint mechanism is overbroad.").

---

[13] Indeed, the CEO of the Port Authority has tweeted and otherwise issued statements in support of "Black Lives Matter."  *See* FOF, ¶ 18.

Second, the Port Authority has also made no attempt to tailor its policies to specific workplace contexts where there might be a heightened risk of disruption. The Union is comprised of several different types of employees, with different roles. Some employees drive buses; some are mechanics; some are instructors; some are disciplinary-hearing representatives. FOF, ¶ 3(a). But the policy here applies without regard for whether disruptive potential exists in each of the many contexts where Port Authority employees work (*e.g.,* on a bus, at the garage, at service centers, in disciplinary or other union hearings, in meetings, during training sessions, and in the field). Yet the evidence established that the risk of disruption varies widely across these different contexts.

For example, there is evidence that a bus driver wearing a mask aboard his or her own bus does not pose much risk of disruption—drivers are the only employee aboard, they sit behind a shield, buses currently operate at reduced capacity (and presumably will do so for as long as facemasks are necessary), no customer has complained to the Port Authority about a mask worn by a bus driver, and several drivers testified that the only customer comments they have received regarding their masks have been uniformly positive. FOF, ¶¶ 28, 32. Similarly, the Court perceives no evidence of disruption associated with employees wearing masks while working in the garage, or in a conference room during a disciplinary hearing.

In contrast, there is arguably some reason for concern in the specific context of training instructors wearing masks during training sessions. In that context, where the instructor determines if new recruits "pass" or "fail," the Port Authority might have a legitimate interest in guarding against the appearance of bias by banning masks reflecting a position on a political or social-protest issue. Yet the Port Authority's policy does not reflect any of this sort of context-specific nuance or tailoring. Absent more careful tailoring, directed to the specific context in which disruption is likely to arise, the policy runs afoul of the First Amendment.

### iii.   The Port Authority does not have a strong interest in enforcing a "pristine" uniform.

In defending its policy, the Port Authority also cites a few cases that have upheld prohibitions on uniform adornments against First Amendment challenges. *See, e.g., Commc'ns Workers of Am. v. Ector County Hosp.*, 467 F.3d 427 (5th Cir. 2006); *U.S. Dep't of Justice v. FLRA,* 955 F.2d 998 (5th Cir. 1992); *Risk v. Burgettstown Borough, Pa.*, No. 05-1068, 2007 WL 2782315 (W.D. Pa. Sept. 21, 2007) (Lenihan, J.).   But these and other similar cases have invariably involved law enforcement agencies, paramilitary organizations, or, in some circumstances, hospitals.  *See Risk*, 2007 WL 2782315 (borough police officers); *FLRA*, 955 F.2d 998 (INS patrol agents); *Commc'n's Workers of Am.,* 467 F. 3d 427 (various hospital workers); *but see Herrera v. Med. Ctr. Hosp.*, 241 F. Supp. 2d 601, 611–13 (E.D. La. 2002) (holding that fact issues existed as to whether public hospital had strong enough interest to prohibit carpenter from wearing a union pin).

What all these entities share is a uniquely strong interest in projecting uniformity, discipline, and neutrality, either internally or to the general public. *See, e.g., Risk*, 2007 WL 2782315, at *2 (holding that officer's First Amendment rights at work were "far outweighed by the necessity of maintaining police uniforms as a symbol of neutral government authority, free from expressions of personal bent or bias.") (cleaned up); *Smith v. United States*, 502 F.2d 512, 517 (5th Cir. 1974) (VA hospital could prohibit staff psychologist from wearing peace pin while administering psychotherapy to "emotionally disturbed" veterans, due to likelihood that pin would cause psychological "harm to the very patients he is employed to assist on treating").

 But outside of those contexts, public employers are not entitled to the same level of deference, and "[m]ere incantations that a pristine uniform is necessary to provide safe public transportation" are "clearly insufficient to legitimatize an anti-adornment rule which renders nugatory all expressions of constitutionally protected

speech contained on a button, badge[,] insignia," or, as here, a mask. *Scott v. Goodman*, 961 F. Supp. 424, 428 (E.D.N.Y. 1997), *aff'd sub nom. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999)*; see also Herrera*, 241 F. Supp. 2d at 611–13 ("[I]n these cases the Fifth Circuit allowed the INS and the police department to satisfy their burden by asserting that uniform regulations are critical to obedience and commitment. … Outside of the military context, of course, public employers are not entitled to the same high level of deference.") (citations omitted); *Liverman v. City of Petersburg*, 844 F.3d 400, 407-08 (4th Cir. 2016) ("[S]uch deference applies with special force to police departments because they are paramilitary—discipline is demanded, and freedom must be correspondingly denied.") (cleaned up).

While the Port Authority surely has some degree of interest in adopting a uniform to promote obedience and cohesion among its employees, it is not a law enforcement agency or paramilitary organization and it does not have any obvious interest in enforcing a "pristine" uniform, free from unintrusive uniform adornments like small buttons or facemask logos. *Cf. Pierce*, 586 F. Supp. at 1561 ("[I]t is claimed that the wearing of buttons might cause political problems between subordinates and supervisors as well as between fellow employees. This argument would be more persuasive were it not for the fact that most federal agencies either lack 'button' regulations altogether or fail to enforce such regulations as may be on their books.").

Indeed, the testimony in this case established that uniform violations— including violations of the ban on political and social-protest adornments—are commonplace and laxly enforced within the Port Authority. FOF ¶¶ 9-10.  The Port Authority's Chief Legal Officer also described such violations as "minor."  FOF, ¶ 13. In other words, even if there were, as a matter of law, support to treat transit employees the same as police officers with respect to furthering an interest in having pristine uniforms, as a matter of fact, the evidence here shows that the Port Authority's long-time tolerance for Black Power necklaces, ankhs, Clinton buttons,

Obama buttons, Biden buttons, Trump 2020 stickers, and the like undermines (and calls into doubt the existence of) any such interest.

Given this, and the lack of evidence that political or social-protest speech of the kind prohibited by the Port Authority's original policy poses a risk of workplace or operational disruption, the Court finds that the Port Authority lacks any legitimate interest in prohibiting employees from wearing masks adorned with such messages.

## B.  The Port Authority's new facemask policy suffers from the same constitutional problems.

Of course, the Port Authority's view is that everything discussed thus far is now moot because it has adopted a new, "neutral" policy.  That policy provides that the "only masks and other face coverings permitted to be worn while on duty" are (1) "Port Authority-issued logo masks with Port Authority's logo printed on the mask"; (2) "ATU Local 85-issued logo mask with ATU Local 85's logo printed on the mask"; (3) "solid black or solid blue" color "masks or gaiter style face coverings," either issued by the Port Authority or "brought from home;" and (4)  "clear face shields" or "surgical-style, N-95 rated or KN-95 rated masks," either issued by the Port Authority or "brought from home so long as [they] … do not have any visible logos, images, texts or other markings on them." ECF 40-1, PDF p. 4; *see also* FOF, ¶ 25.  The new policy further provides that "no other masks or face coverings are permitted to be worn while on duty"  and that "[p]ermitted masks or face coverings shall not be altered or affixed with any pins, stickers, logos, images, text, color[,] and/or color combination or scheme not permitted as described above." ECF 40-1, PDF p. 4.  The Port Authority argues that this broader policy is content and viewpoint neutral, and therefore consistent with the First Amendment.

In taking this approach, the Port Authority has "burn[ed] the house to roast the pig," *Butler v. State of Mich.*, 352 U.S. 380, 383 (1957), which the First Amendment does not allow.  The Port Authority offers the same justification for the

new policy that it offered for the old—it was adopted to ban the political and social-protest speech it views as disruptive, just in a more readily administrable way.  FOF, ¶¶ 23-25.  In various First Amendment contexts, courts have recognized that even a facially neutral policy can violate the Constitution if the government's "asserted *interest* is related to the suppression of free expression … and concerned with the content of such expression." *United States v. Eichman*, 496 U.S. 310, 315 (1990) (cleaned up; emphasis in original); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. … The government's purpose is the controlling consideration. … Government regulation of expressive activity is content neutral so long as it is ***justified without reference to*** the content of the regulated speech.") (cleaned up; emphasis added); *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 10 (D.D.C. 1996) ("Pursuant to extensive First Amendment jurisprudence, the government's rationale for the regulation controls, regardless of the form of the speech or expression regulated.") (emphasis added).

Again, aside from any general interest the Port Authority might have in enforcing a "pristine" uniform (which, as discussed, is not strong) and its desire to ban all political and social-protest messages (which, as discussed, is not constitutional), the Port Authority has not articulated any interest to justify restricting its employees from wearing masks that display messages related to matters of public concern.  In particular, the Port Authority has not proffered any safety-based rationale for requiring the particular masks it has specified.  Nor is it clear how the content of the mask could relate to any such concern.  Thus, the policy remains a prior restraint on employee speech, with no work-related justification aside from the perceived disruptiveness of political or social-protest messages.

As a result, the new policy makes the problem here worse, not better.  The Port Authority cannot cure an unconstitutional prohibition on displays of political or social-protest messages by banning even *more* employee speech along with those messages, with no independent justification.  *See Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 361 (2010) ("[I]t is our law and our tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech during the critical preelection period is not a permissible remedy."); *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("[T]he remedy to be applied is more speech, not enforced silence"); *Rappa v. New Castle Cty.,* 18 F.3d 1043, 1072–73 (3d Cir. 1994) ("Eliminating the offending exception would mean that we would be requiring the State to restrict more speech than it currently does. … We refuse to strike down the exception in part because of the special status of speech in our constitutional scheme, a scheme which generally favors more speech."); *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 194 (D. Mass. 2015) ("An alternative interpretation in which 'intimidating' was not merely duplicative would restrict more speech and require a stronger justification still.").

What appears to be motivating the new broader policy is the desire to enact a content and viewpoint-neutral policy. *See* ECF 39-1, PDF p. 47 ("If Port Authority allows uniforms to be used as a message board for some political or social protest topics, we must then allow all messages on that topic, including those that could disrupt Port Authority's ability to deliver public transit service in a safe and efficient manner and cause harm to our employees, customers, and communities.").  As noted above, the Port Authority supports "Black Lives Matter"; it simply does not want to open the door to competing viewpoints, and believes it cannot enact a content or viewpoint discriminatory policy targeted to limit those competing views. FOF, ¶ 20.

But there is nothing in *NTEU, Pickering,* or any other precedential case from the Supreme Court or Third Circuit that forbids content or viewpoint-based discipline

in the context of public employment. Content and viewpoint discrimination are concerns that ordinarily arise where the government restricts speech in public forums, not in the workplace. *See Cochran v. City of Atlanta, Georgia*, 289 F. Supp. 3d 1276, 1292–94 (N.D. Ga. 2017) (discussing and rejecting a concern over viewpoint discrimination in the context of *Pickering* balancing test); *see also id.* at 1294 ("[I]f a public employer could constitutionally fire an employee for using racial slurs in the workplace under *Pickering*, under Plaintiff's reasoning, that employee could later prevail in a viewpoint discrimination claim by showing that the public employer did not fire employees who promoted racial equality."); *see, e.g., Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 652 (9th Cir. 2006) (applying *Pickering* balance test where government employer prohibited employee from expressing his religious views by displaying religious items in his cubicle). In other words, nothing prevents the Port Authority from analyzing specific instances of employee speech for potential disruptiveness, rather than imposing a prior restraint on an entire category of important and highly protected speech.[14]

In sum, the Port Authority's new policy violates the First Amendment in the same manner as its old policy, and fails under both the *Pickering* and *NTEU* standards, for the reasons discussed above.

All that being said, the Court's analysis here is guided by the specific facts of this case, and the evidence presented to it at the preliminary-injunction hearing. This evidence included speech of indisputably great public concern. It included a facially

---

[14] The Port Authority is right to be worried about enacting a viewpoint or content-based policy that attempts to define "disruptive" speech in a vacuum. So, what's the Port Authority to do? In the end, having no policy may be better than a broad prior restraint. As noted above, targeted enforcement of any problems caused by uniform adornments that result in disruption can likely be addressed by disciplining individual employees based on disruptive conduct tied to conduct-based policies. And regarding speech, the Port Authority remains free to discipline speech that is unprotected by the First Amendment or that does not touch on matters of public concern.

neutral policy, but one that quite obviously was directed to target "Black Lives Matter," as well as any potentially competing facemask messages, using the bluntest possible instrument—a categorical, prior restraint aimed at core political speech and reflecting no attempt at tailoring based on context or non-speech considerations. It included a long history of Port Authority employees using uniform adornments and accessories to express political and social-protest speech, notwithstanding the Port Authority's on-the-books policy, without any evidence of resultant disruption. It included an evidentiary record that allowed the Court to assess any actual disruption caused by the specific speech at issue over a several-month period, during a time when racial tensions across the country were at their peak. And it included the narrow issue of specific facemasks to be worn by transit employees for hopefully only a short time longer due to a global health pandemic.[15] This confluence of factors compels the outcome here.

For all these reasons, the Court finds that the Union has a reasonable probability of success on the merits of its First Amendment claim. The Port Authority has not shown that the prohibition on "Black Lives Matter" masks is necessary to avoid workplace or operational disruption. And absent such a showing, the Port Authority's policy does not comport with its employees' "right to speak freely on matters of public concern." *Curinga*, 357 F.3d at 309 (citations omitted).

## II.  The remaining injunction factors also favor granting the Union's motion for preliminary relief.

What is left, then, is to consider the remaining injunction factors. First, the Union will suffer irreparable harm if an injunction is not issued. "The loss of First

---

[15] As reflected in the Court's separate order, the injunction here enjoins enforcement of the Port Authority's policy as to the specific facemask messages described or shown to the Court during the hearing and masks that contain substantially the same messages, as those facemasks all undisputedly concern messages of public concern. No other facemask has been placed at issue by Plaintiffs' motion.

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) ("The ban prevents B.H. and K.M. from exercising their right to freedom of speech, which unquestionably constitutes irreparable injury.") (cleaned up).

Second, the issuance of an injunction would not "result in even greater harm" to the Port Authority. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). Even if invalidating the policy might create some administrative headaches (and there is no evidence of that), the Port Authority "cannot properly claim a legitimate interest in enforcing an unconstitutional [policy]." *Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015); *see also ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3d Cir. 2003) ("Neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.").

Third, granting a preliminary injunction is in the public interest.  "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994).  Moreover, "there is a significant public interest in upholding First Amendment principles." *Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015); *see also Ramsey v. City of Pittsburgh, Pa.*, 764 F. Supp. 2d 728, 735 (W.D. Pa. 2011) (Cercone, J.) ("[C]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

For these reasons, all injunction factors favor relief and the Union is entitled to a preliminary injunction.

III.   **The Court will require the Union to post a nominal bond of $100 before the preliminary injunction will issue.**

Federal Rule of Procedure 65(c) "mandates that a court when issuing an injunction must require the successful applicant to post adequate security." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988); *see* Fed. R. Civ. P. 65(c) ("No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."). However, "the amount of the bond is left to the discretion of the court[.]" *Frank's GMC Truck Ctr., Inc.*, at 847 F.2d at 103. Here, because the Union "seek[s] injunctive relief to protect [employees'] First Amendment rights," and because the Port Authority "did not offer any evidence that [it] will suffer a financial loss as a result of the injunction," the Court will "require [the Union] to post a nominal bond of $100 before the preliminary injunction will issue." *Am. Freedom Def. Initiative v. Se. Pennsylvania Transp. Auth.*, 92 F. Supp. 3d 314, 331 (E.D. Pa. 2015).

## <u>CONCLUSION</u>

For all the reasons discussed above, the Court grants Plaintiffs' motion for a preliminary injunction. ECF 2. An appropriate order follows.

DATED: January 19, 2021                    BY THE COURT:

                                           <u>/s/ J. Nicholas Ranjan</u>
                                           United States District Judge