IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 85, *et al.*, | )<br>)<br>)<br>) 2:20-cv-1471-NR<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | )<br>) |
| PORT AUTHORITY OF ALLEGHENY COUNTY, | )<br>)<br>) |
| Defendant. | )<br>) |

## **MEMORANDUM OPINION**

**J. Nicholas Ranjan, United States District Judge**

On January 19, 2021, the Court granted the Union's preliminary-injunction motion, enjoining the Port Authority from enforcing its facemask policy to ban employees' from wearing "Black Lives Matter" facemasks. ECF 44. The Port Authority appealed that decision to the Third Circuit, and now asks this Court to stay its injunction order pending that appeal. ECF 50, ECF 51, ECF 53. Applying the familiar four-part test for stays pending appeal,[1] the Court will deny the Port Authority's motion, for the reasons that follow. The Court will, however, address the factors for a stay in reverse order, because of serious concerns that the Court has with respect to a stay's impact on the public interest and relative harms of the interested parties including, specifically, the Port Authority's employees.

---

[1] In considering whether to grant a stay pending appeal under Fed. R. Civ. P. 62(c), the Court must weigh (1) whether the stay applicant has made a strong showing that he or she is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). This standard "is essentially the same as that for obtaining a preliminary injunction." *Conestoga Wood Specialties, Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013). However, in the Third Circuit, the bar for obtaining a stay pending appeal is "particularly high," and "[s]uch stays are rarely granted[.]" *Id.*

**DISCUSSION & ANALYSIS**

**I.     Public Interest & Relative Harm.**

Initially, a stay would not be in the public interest, and would cause substantial harm to the Union and its members.

Granting a stay would have the effect of allowing the Port Authority to enjoin speech of public importance that is protected by the First Amendment. That would be contrary to the public interest and cause harm to those employees who seek to exercise their First Amendment rights. *See B.H. ex rel. Hawk v. Easton Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) ("The ban prevents B.H. and K.M. from exercising their right to freedom of speech, which unquestionably constitutes irreparable injury."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015) ("[T]here is a significant public interest in upholding First Amendment principles."); *ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3d Cir. 2003) ("Neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.").

Further, there is also a more practical harm that would result from a stay here. That is, granting a stay could effectively moot the entire lawsuit, handing the Port Authority a complete or near-complete victory by virtue of litigation delay alone.

Appeals in the Third Circuit, on average, take almost 10 months to decide from the date a notice of appeal is filed.[2] At the same time, while very much uncertain, the increasing availability of COVID-19 vaccines, and potential for herd immunity in the not-so-distant future, suggests at least the possibility that mask mandates could

---

[2] *See* United States Courts, *U.S. Courts of Appeals—Median Time Intervals in Months for Cases Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2019*, available at https://www.uscourts.gov/sites/default/files/data_tables/jb_b4_0930.2019.pdf

become unnecessary within that timeframe. Thus, if this Court were to grant a stay, the Union members could be subjected to an unconstitutional policy for its remaining duration, without ever having a meaningful opportunity to obtain recourse from the courts.

Under these circumstances, granting a stay would, in the Court's view, be an unacceptable dereliction of its judicial duty, and cause substantial harm to individual employees' First Amendment rights. *Cf. Wtulich v. Filipkowska*, No. 16-2941, 2019 WL 2869056, at *6 (E.D.N.Y. July 3, 2019) ("Granting a stay during the pendency of this appeal would effectively nullify the Convention by allowing one party to moot its remedial scheme by litigating a case until a wrongfully retained child reaches maturity."); *Sierra Club v. Trump,* No. 19-892, 2019 WL 2305341, at *1 (N.D. Cal. May 30, 2019) ("Defendants' request to proceed immediately with the enjoined construction would not preserve the status quo pending resolution of the merits of Plaintiffs' claims, and would instead effectively moot those claims.").

Given these considerations, the Court finds that the "public interest" and "relative harm" factors both weigh heavily against granting a stay pending appeal.

**II.    Irreparable Harm.**

The Port Authority has also failed to establish that it will suffer irreparable harm in the absence of a stay.

In arguing that it will suffer such harm, the Port Authority relies on the same generalized fear of "potential disputes and disruption" that the Court rejected as unsupported in its decision. ECF 51, pp. 18-19; ECF 44, pp. 28-43. To begin with, as the Court found on a comprehensive evidentiary record after two days of testimony, no actual disruption occurred during either the few months in which Port Authority drivers freely wore "Black Lives Matter" masks, or the many years in which the Port Authority tolerated its drivers wearing buttons and other uniform adornments with equivalent "political or social protest" messages. *See* ECF 44, pp. 28-43.

Significantly, the Port Authority has not identified any new incidents or examples of disruption in the month since the Court issued its decision. Instead, as purported evidence of the disruptive potential of "Black Lives Matter" masks, the Port Authority points only to the January 6, 2021, insurrection at the United States Capitol (which did not involve the "Black Lives Matter" movement at all) and a local media report about someone vandalizing four Biden/Harris and two "Black Lives Matter" signs in Greensburg, Pennsylvania (Westmoreland County) around the time of the presidential inauguration. ECF 51, pp. 18-19.[3] The Court fails to see the relevance of these unrelated events—neither of which occurred in Allegheny County, nor concern facemasks or the Port Authority's operations.

This lack of any actual or imminent disruption, coupled with the Port Authority's continued failure to present other evidence that such disruption is likely to occur in the future, demonstrates that there is no basis for the Port Authority's contention that it will experience meaningful disruption if the Court's injunction is not stayed. Indeed, as the Court addressed in its prior opinion, conversations between, and statements by, employees on matters of public concern "routinely tak[e] place at all levels in the workplace," and the risk that such speech "will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful." *Rankin v. McPherson,* 483 U.S. 378, 393 (1987) (Powell, J. concurring). The peaceful, passive speech at issue here is no exception.

For these reasons, the Port Authority has not shown that it will suffer irreparable harm if the Court declines to stay its injunction. The absence of any

---

[3] In response to the vandals putting an "X" through a few BLM signs, the owner of the sign engaged in peaceful counter-speech, for example, placing a homemade sign next to the defaced ones. The homemade sign had an arrow pointing to the vandalism and noted "Black Lives DO Matter." *See* P. Pierce, *Vandals Damage Biden, Black Lives Matter Signs in Greensburg*, TRIBLIVE.COM available at https://triblive.com/local/westmoreland/ vandals-damage-biden-black-lives-matter-signs-in-greensburg/.

irreparable harm alone compels the denial of the Port Authority's motion. *Cf. In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) ("[A] failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction."); *Exec. Home Care Franchising LLC v. Marshall Health Corp.*, 642 F. App'x 181, 183 (3d Cir. 2016) ("We conclude that the District Court properly disposed of Executive Care's motion for a preliminary injunction on the basis of the 'irreparable harm' requirement."); *B.P.C. v. Temple Univ.*, No. 13-7595, 2014 WL 4632462, at *5 (E.D. Pa. Sept. 16, 2014) ("Because of the failure to establish irreparable harm, the other factors (likelihood of success, balance of harms and public interest) need not be addressed.").

### III. Likelihood of Success.

Finally, the Port Authority is not likely to succeed on the merits of its appeal. The Port Authority raises several specific arguments, which the Court addresses below. But before it does so, there are three important broader considerations here that suggest that the Port Authority is unlikely to prevail in its appeal.

First, the Court's prior decision was expressly narrow and tethered to the facts—compelled largely by the rather unique circumstances of this case and the particular evidentiary record. Thus, for the Port Authority to prevail on appeal, the Third Circuit would essentially need to disagree with how the Court weighed the evidence and the credibility of certain witnesses—which often tends to be a more difficult path to prevail on appeal.

Specifically, the Court found as follows:

> [T]he Court's analysis here is guided by the specific facts of this case, and the evidence presented to it at the preliminary-injunction hearing. This evidence included speech of indisputably great public concern. It included a facially neutral policy, but one that quite obviously was directed to target "Black Lives Matter," as well as any potentially competing facemask messages, using the bluntest possible instrument—

> a categorical, prior restraint aimed at core political speech and reflecting no attempt at tailoring based on context or non-speech considerations. It included a long history of Port Authority employees using uniform adornments and accessories to express political and social-protest speech, notwithstanding the Port Authority's on-the-books policy, without any evidence of resultant disruption. It included an evidentiary record that allowed the Court to assess any actual disruption caused by the specific speech at issue over a several-month period, during a time when racial tensions across the country were at their peak. And it included the narrow issue of specific facemasks to be worn by transit employees for hopefully only a short time longer due to a global health pandemic. This confluence of factors compels the outcome here.

ECF 44, pp. 42-43.

Second, the Port Authority's arguments for a stay largely skirt the central issue in this case—whether it has established actual or likely disruption associated with employees wearing "Black Lives Matter" masks. Instead, the Port Authority cobbles together arguments based on several, unrelated First Amendment concepts from outside the public employment context (*e.g.*, viewpoint discrimination, "Heckler's Veto," forum analysis, advertising speech). The focus on these ancillary topics largely obscures the critical—and legally uncontroversial—question under *Pickering* and *NTEU*, which is this: Did the evidence that the Port Authority presented to the Court sufficiently establish an actual or likely risk of disruption associated with the masks at issue? Almost all of the arguments that the Port Authority raises in its stay motion (which presumably are the same as those to be raised on appeal) evade that critical question. This suggests a fundamental weakness in the Port Authority's position, making it unlikely to prevail on appeal.

Third, even accepting all of the arguments that the Port Authority makes, it still hasn't demonstrated that its policy is tailored to address its feared risk of disruption. Under both *NTEU* and *Pickering*, some degree of tailoring is required. *See Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Phila.*, 763 F.3d 358, 375 (3d Cir. 2014) ("While *NTEU* did not explicitly establish a tailoring

requirement, we have noted that such a requirement seems to be implicit in the Court's discussion.") (cleaned up); *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977) (under *Pickering*, "regulations may be promulgated, but their restrictive effect may extend only as far as is necessary to accomplish a legitimate governmental interest."); *Wolfe v. Barnhart*, 446 F.3d 1096, 1107 (10th Cir. 2006) ("Other courts have recognized that the tailoring requirement is an important aspect of the *Pickering / NTEU* analysis.") (citations omitted); *see, e.g., Guthrie v. Bradley*, No. 06-0619, 2008 WL 4279805, at *7 (W.D. Pa. Sept. 15, 2008) (Conti, J.) ("While these are legitimate government concerns, regulations enacted for the purpose of realizing these goals can have no greater restrictive effect than necessary for their accomplishment.").

At a minimum, as addressed by the Court's prior decision, the Union employees hold disparate positions that differ in significant ways, such that the risk of disruption, if any, would differ considerably as between a driver, mechanic, hearing officer, instructor, etc., and must be accounted for in crafting any prior restraint. ECF 44, p. 6, Finding of Fact 3(a); *id.* at p. 36.  The Court also identified other concerns regarding the scope of the Port Authority's policy, which it found arbitrarily underinclusive in some respects, while overbroad in others.  *See id.* at pp. 34-36; *cf. Lodge No. 5 of Fraternal Order of Police ex rel. McNesby*, 763 F.3d at 385 ("[T]he City claims that the ban is part and parcel of a larger scheme that insulates police officers from all politics, while simultaneously condoning political activities by the police that have similar, if not more pernicious implications.  Given the lack of fit between the City's stated objectives and the means selected to achieve it, we hold the Charter ban unconstitutional.").

In short, as the Court previously found, an "across-the-board prohibition of the wearing of political [facemasks] is invalid" where "there are far less sweeping means available to safeguard legitimate governmental interests." *Am. Fed'n of Gov't*

*Employees*, *AFL-CIO v. Pierce*, 586 F. Supp. 1559, 1561 (D.D.C. 1984) (holding that Veterans' Administration policy prohibiting employees from wearing political buttons while on duty was overly broad and unconstitutional); *see also Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d Cir. 2002) ("Speech codes are disfavored under the First Amendment because of their tendency to silence or interfere with protected speech.").

For these reasons alone, the Port Authority is unlikely to prevail on the merits of its appeal.

With respect to the specific arguments that the Port Authority makes, none of them suggest that the Port Authority is reasonably likely to prevail on appeal either.

**Viewpoint Discrimination**

To begin with, the Port Authority argues that the Court made its "most glaring" error when it "erroneously directed the Port Authority to engage in unlawful viewpoint discrimination by permitting some (but not all) facemasks containing political or social protest messages." ECF 51, p. 3 (cleaned up). The Court did no such thing, and so this argument falls short.

To be sure, the Court observed in dicta that *NTEU* and *Pickering* do not appear to forbid viewpoint discrimination, in that they authorize an employer to assess whether individual instances of speech are likely to cause disruption, without necessarily prohibiting all other speech arguably within the same "category" (here, all "political and social-protest" speech).[4] But the Court also made clear that it agreed

---

[4] *See Cochran v. City of Atlanta, Ga.*, 289 F. Supp. 3d 1276, 1294 (N.D. Ga. 2017) ("[I]f a public employer could constitutionally fire an employee for using racial slurs in the workplace under *Pickering*, under Plaintiff's reasoning, that employee could later prevail in a viewpoint discrimination claim by showing that the public employer did not fire employees who promoted racial equality."); *see also United States v. National Treasury Employees Union ("NTEU")*, 513 U.S. 454, 467 (1995) (explaining that *Pickering* permits employer to conduct "post hoc analysis" of employee speech and its "impact on that employee's public responsibilities."); *Rankin*, 483 U.S. at 388 (in evaluating an employee's speech under *Pickering*, a public employer may consider

with the Port Authority with respect to the potential evils of viewpoint discrimination, when it stated: "The Port Authority is right to be worried about enacting a viewpoint or content-based policy that attempts to define 'disruptive' speech in a vacuum." ECF 44, p. 42 n.14. The point of the Court's discussion on this issue wasn't to endorse viewpoint discrimination, but rather to point out that the Port Authority could ably address any legitimate concerns regarding speech or conduct that goes beyond the passive display of "Black Lives Matter" masks at issue through different, constitutional means—such as by applying policies focused on conduct,[5] by developing viewpoint-neutral criteria for assessing whether employee speech is likely to cause disruption, or by regulating unprotected or private speech directly. ECF 44, p. 42 n.14 ("So, what's the Port Authority to do? In the end, having no policy may be better than a broad prior restraint. As noted above, targeted enforcement of any problems caused by uniform adornments that result in disruption can likely be addressed by disciplining individual employees based on disruptive conduct tied to conduct-based policies. And regarding speech, the Port Authority remains free to discipline speech that is unprotected by the First Amendment or that does not touch on matters of public concern.").

---

"whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.").

[5] A public employer is permitted to adopt conduct-oriented policies touching on disruptive speech that would be unconstitutionally vague in other settings. For example, a prohibition on employees being "rude to customers" is permissible. *See Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("[A] public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large."). Thus, the Port Authority has wide latitude to forbid its employees from going beyond the passive display of a "Black Lives Matter" mask at issue here.

### **"Captive Customers"**

The Port Authority next argues that the Court "disregarded [the] Port Authority's interest in protecting its captive customers from political and social protest messages." ECF 51, p. 7 (cleaned up).[6] This argument fails because the Court did, in fact, carefully consider, and make multiple factual findings regarding, whether facemasks that display the message "Black Lives Matter" (or the equivalent) were likely to interfere with, among other asserted interests, the Port Authority's desire to maintain good relations with bus-riding patrons. ECF 44, pp. 7-22, FOF ¶¶ 7-41, pp. 28-36. The Court concluded, based on the record before it, that such disruption was unlikely to occur.

In particular, the Court first found that there was an absence of evidence of actual disruption caused by a "Black Lives Matter" mask or, for that matter, any of the many political and social-protest uniform adornments worn by Port Authority employees over the years. There was no evidence of even a single complaint received from the bus-riding public about a driver wearing a mask or other uniform adornment. *Id.* at p. 17, FOF ¶ 27. There was no evidence of any workplace conflict, emotional distress, or violence between employees or members of the public related to masks or uniform adornments. *Id.* at pp. 17-18, FOF ¶ 29-33. There was no evidence of any mask or uniform adornment impeding employees from working efficiently. *Id.* at p.17, FOF ¶ 31. And there was no evidence of any other negative

---

[6] Notably, the cases on which the Port Authority relies to make this point arise in a different context—advertising on public transit. ECF 51, p. 9, 11-12; *see, e.g., Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356 (D.C. Cir. 2018)*; Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650 (2d Cir. 1995). That concerns a different legal framework (examining speech restrictions in the context of a forum analysis). It also concerns a more troubling factual setting—large signs and placards that customers are forced to stare it, contrasted with the unobtrusive facemasks that the Port Authority drivers wear and which are, at most, only briefly seen in passing.

impact attributable to employees wearing masks or other adornments of a political or social-protest nature. *Id.* at pp. 17-18, FOF ¶¶ 27-41.

All of this was despite employees freely wearing "Black Lives Matter" masks for several months in the early days of the pandemic, as well as evidence that Port Authority employees have regularly and widely worn political and social-protest buttons, jewelry, and other adornments without incident for *years*, notwithstanding the Port Authority's nominal policy against such adornments. *Id.* at p. 8, FOF ¶¶ 9, 10(a)-(w).

The Court also found, as part of the relevant context, that, due to the pandemic, Port Authority buses operate at reduced capacity, and bus drivers now sit behind a plastic shield, usually facing forward, and have only limited, brief interactions with bus patrons as they enter or exit the bus. *Id.* at p. 18, FOF ¶ 33.

Given the record before the Court, the Port Authority's argument regarding "captive" customers being subjected to the "blare of political and social protest propaganda" is simply unsupported.

### **Anticipated Disruption**

Next, the Port Authority argues that the Court "effectively eliminated [the] Port Authority's right to prevent anticipated disruption before it occurs." ECF 51, p. 11. To the contrary, the Court applied the correct standard and specifically explained why the Port Authority had failed to show that the speech in question was "likely" to cause disruption. *See, e.g.,* ECF 44, p. 24 ("[W]hile the government 'need not show the existence of actual disruption' caused by the employee's speech, it must at least show 'that disruption is likely to occur because of the speech.'") (citations omitted); *id.* at p. 30 ("Under *Pickering*, a government-employer's reasonable prediction of 'likely' disruption can be enough, so long as the feared disruption is significant enough to overcome the employee's expressive interests."); *id.* at pp. 31-34.

Of course, the Court, relying on Third Circuit precedent, explained that the lack of actual disruption was strong evidence of a lack of likely disruption. ECF 44, pp. 29-30; *see Watters v. City of Phila.*, 55 F.3d 886, 896 (3d Cir. 1995) (noting that evidence of "actual disruption" would "obviously be highly relevant" to the *Pickering* analysis). That was particularly true because, as discussed, the Court was presented with a significant sample size of employees wearing both the specific masks at issue (for several months) and other equivalent uniform adornments (for many years)—all without so much as a single customer complaint or workplace conflict to show for it.

But beyond that, the Court examined the evidence that the Port Authority proffered to establish a likelihood of disruption, and explained why it did "not find this to be persuasive evidence of potential disruptiveness for purposes of a *Pickering* analysis." ECF 44, p. 31. That evidence consisted chiefly of a handful of social media and text message discussions between Union members. ECF 44, pp. 19-22, FOF ¶¶ 36-41, pp. 29, 31-32. As discussed in detail in the Court's factual findings, these messages were reflective of, at most, internal debate among a few, outspoken Union members discussing whether the Union should pursue this litigation or otherwise support the wearing of "Black Lives Matter" masks. *Id.* at pp. 19-22, FOF ¶¶ 36-41, p. 29 n. 8. There is no evidence that any of this discussion spilled out of the virtual world and resulted in conflict, distraction, or discord in the workplace.[7]

In connection with this same argument, the Port Authority also argues that the Court was wrong to suggest that "under *Pickering*, 'threatened disruption by

---

[7] The Port Authority argues that the Court did not properly weigh the evidence in the context of the heighted racial tensions and protests throughout the summer of 2020, including those in the Pittsburgh area. But the Court did consider this context, and found that it weighed in the opposite direction. That is, the Court found it to be telling that no disruption related to employees wearing "Black Lives Matter" masks occurred despite employees being permitted to wear such masks "during a time when racial tensions across the country were at their peak." ECF 44, p. 43.

others as a result of speech may not serve as a justification for public employer discipline' at all." ECF 44, p 33. There is ample support for this legal proposition.[8] But even if there were not, the Court nonetheless considered the threatened disruption, including the threatened disruption by riders, as noted above, and found that such fears were unsupported by the evidence.

### On-Duty Speech

Finally, the Port Authority argues that the Court "failed to recognize the employees' limited interest in engaging in political or social protest speech while on duty." ECF 51, p. 16. To the contrary, the Court devoted an entire section of its opinion to this argument. ECF 44, pp. 27-28.

As the Court explained there, it is certainly relevant that the Port Authority did not attempt to ban its employees from wearing masks or buttons outside of work.

---

[8] *See, e.g., Scruggs v. Keen*, 900 F. Supp. 821, 833–34 (W.D. Va. 1995) ("It is well-established that threatened disruption by others as a result of speech may not serve as a justification for public employer discipline."); *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) ("The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future."); *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("[T]he perceived threat of disruption … was caused not by the speech itself but by threatened reaction to it by offended segments of the public. … [W]e think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action[.]").

The Port Authority argues that the Third Circuit's decision in *Munroe* is to the contrary. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d Cir. 2015). Not so. That case concerned a teacher who posted derogatory comments about her students on a blog. After acknowledging the "truism that community reaction cannot dictate whether an employee's constitutional rights are protected," the Third Circuit held that, under *Pickering*, the school could nonetheless consider the risk that the plaintiff's disparagement of students would disrupt the school's relationship with parents. *Id.* at 475 (cleaned up). But the Third Circuit carefully cabined its holding to the unique scenario involving the "special (perhaps even unique) relationship that exists between a public school teacher … on one hand, and his or her students and their parents, on the other." *Id.*

Such a restriction would clearly be unconstitutional. But "on duty" speech is not exempt from First Amendment protection either. *See Urofsky v. Gilmore*, 216 F.3d 401, 407 (4th Cir. 2000) ("An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace."); *see, e.g., Rankin*, 483 U.S. at 379–80 (holding that clerical employee could not be constitutionally discharged for stating "[i]f they go for him again, I hope they get him," in reference to attempted assassination of President Reagan, during a conversation at work); *Am. Fed'n of Gov't Employees v. D.C.*, No. 05-0472, 2005 WL 1017877, at *10 (D.D.C. May 2, 2005) ("[T]he same balancing test applies during duty hours, although the potential for 'immediate workplace disruption' would be greater in such situations.") (citation omitted).

Thus, to ban "on duty" speech on matters of public concern, the Port Authority still needed to show that disruption was likely to result if employees were permitted to engage in that speech. In other words, the fact that the speech restricted here was not "off duty" speech is only one data point weighed in the *Pickering / NTEU* balance. As has now been discussed extensively, that fact was thoroughly outweighed by the other evidence here.

For all these reasons, the Court is not persuaded that the Port Authority is likely to prevail on appeal. To the contrary, the Court's decision to enjoin a broad prior restraint, prohibiting employees from engaging in passive and peaceful expression of political and social views at work, was well-supported by the First Amendment precedent cited and discussed in the Court's opinion.

## CONCLUSION

As explained above, the Port Authority has not shown that it is likely to prevail on the merits of its appeal; that it will suffer irreparable harm absent a stay; that a stay would be in the public interest; or that the harm the Union would suffer from a stay would not be greater than any harm suffered by the Port Authority. After weighing these factors, the Court concludes that the Port Authority is not entitled to a stay of the Court's injunction during the pendency of its appeal. An appropriate order follows.

DATE: February 24, 2021                         BY THE COURT:

                                                /s/ *J. Nicholas Ranjan*
                                                United States District Judge